[No. B128098. Second Dist., Div. Two. June 30, 2000.]

BREAKZONE BILLIARDS et al., Plaintiffs and Appellants, v. CITY OF TORRANCE, Defendant and Respondent.

1206

**COUNSEL**

Grossblatt & Booth and Hillary Arrow Booth for Plaintiffs and Appellants.

Rutan & Tucker, Philip D. Kohn, M. Katherine Jenson; John L. Fellows III, City Attorney, and Patrick Q. Sullivan, Deputy City Attorney, for Defendant and Respondent.

**OPINION**

GOODMAN, J.*—In this case we consider de novo whether a member of the Torrance City Council may appeal the decision of that city's planning

---

*Judge of Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

commission to grant a conditional use permit, participate in the public hearing and city council deliberations on the appeal, and vote on that appeal. We also review for any substantial evidence the denial by that city council of an application for a conditional use permit that would permit the sale of alcoholic beverages at an existing business and thus alter the nature of the business's clientele and potentially affect adversely adjacent businesses. We will conclude that the council member was not barred from participation and there was substantial evidence to support the council's quasi-judicial action.

## FACTUAL AND PROCEDURAL BACKGROUND

BreakZone Billiards (BreakZone) is a partnership, the partners of which are J. Diane Boyd (Boyd) and David Chartier (Chartier). Since 1994, BreakZone has operated a billiard parlor, oriented to youth, in Rolling Hills Plaza, a retail development zoned C-3 and C-4 near the Torrance airport.

On February 3, 1997, BreakZone applied to the Planning Department of the City of Torrance for a modification to its previously issued conditional use permit (CUP).[1] BreakZone sought permission to sell alcoholic beverages at the new location for its business, which we shall refer to as a billiard parlor, and otherwise expand its operation.[2]

As was its practice, the planning department sent requests for comments to various city departments, including the Torrance Police Department. On April 4, 1997, the police department filed its response in which it objected to the application, stating in the final paragraph of its comments: "Although our department realizes that the Breakzone is a legitimate business geared towards offering entertainment for young people and families alike, based on

---

[1] We take judicial notice of the following sections of the Torrance Municipal Code pursuant to Evidence Code sections 452, subdivision (b) and 459: 11.5.1, 11.5.2, 11.5.4, 13.1.7, 95.1.1, and 95.1.2.

Section 95.1.1 of that code describes conditional uses as "those uses which have a special impact or uniqueness such that their effect on the surrounding environment cannot be determined in advance of the use being proposed for a particular location, making impractical their inclusion in any classes of use set forth in the various zoning districts and, therefore, to warrant special consideration. The purpose of the Conditional Use Permit is to ensure adequate public review of an input on all land uses which could potentially impact the community; and to secure adequate review. At the time of application for Conditional Use Permit, a review of the location, design, configuration and impact of the proposed use shall be conducted by comparing such use to established standards."

[2] The City of Torrance Planning Department Development Application described the proposed use of property as follows: "Utilize existing liquor license at the above location and in accordance with the attached drawings to allow for food service, alcoholic beverage service, recreational facilities including pool, foosball, air hockey, arcade games, pool clinic and lessons, pro shop & Smoke shop." The liquor license was to be transferred to BreakZone, which did not yet have permission from the California Department of Alcoholic Beverage Control Board to sell alcoholic beverages on its premises.

our activity there, it appears to remain a draw for subjects who wish to involve themselves in illegal activity and, it appears, the Breakzone has not taken a responsible position to curtail this illegal and criminal activity. With the amount of alcohol related activity already going on in and around the parking lot and the increased potential for violence posed when subjects consume alcohol, our department feels that by granting a license to the Breakzone to serve alcohol would only add to this problem."[3]

Other city departments also commented on the application. None interposed any substantive objections to the project. In May 1997, the Torrance Environmental Review Board recommended a negative declaration under the California Environmental Quality Act. (Pub. Resources Code, § 21000 et seq.)

In the interim, BreakZone had applied to the California Department of Alcoholic Beverage Control (ABC) for the appropriate authority to sell alcoholic beverages. On September 2, 1997, the Torrance chief of police filed an objection with the ABC to the transfer of the license to sell alcoholic beverages. BreakZone responded to that objection by filing with the ABC an analysis of police contacts in and near BreakZone's location, including the adjacent public parking lot, movie theaters and nearby public buildings. On October 28, 1997, counsel for BreakZone sent the same analysis to each member of the planning commission. Included in the information sent were two police department memos detailing that department's objections to BreakZone's application for a CUP.

In May 1997, counsel for BreakZone filed with the Torrance city clerk a request for public records, by which in 31 numbered paragraphs it sought all records related to the police department's concerns. The same month, Break-Zone asked the city to postpone the hearing before the planning commission on its application for a CUP, which had been set for June 4 until the requested documents had been received and reviewed, and until certain drawings could be completed and provided to the planning department.

On October 1, 1997, counsel for BreakZone acknowledged receipt of unspecified information from the police department and indicated that BreakZone was now ready to proceed with the planning commission hearing. In materials dated October 27, BreakZone submitted its business plan and other information in support of its operation, including 13 letters from patrons and others.

Written opposition to the application for a CUP was filed prior to the hearing by adjacent residential neighbors (the back property line of the

---

[3]The police department comments make reference to a 1996 request by BreakZone for service of alcoholic beverages which that department also opposed. There is nothing else in the record relating to the 1996 application.

property was shared with a residential community), the principal of a private tutoring school located near BreakZone's premises, nine teachers at that school, and 57 parents of students at that school. BreakZone's counsel also filed a letter dated November 4, in which BreakZone provided further response to the police department's objections. This letter addressed certain police department objections which were first made available to BreakZone in the agenda materials for the November planning commission meeting. BreakZone's counsel also asserted in the letter that these items had not been disclosed in response to its earlier public records act request.

BreakZone submitted for the hearing record over 130 letters and cards in support of its project and excerpts from depositions of two Torrance police officers which BreakZone had taken in litigation which BreakZone had instituted against the developer of the center regarding a lease dispute. The depositions were submitted for the purpose of establishing that the criminal activity in the Rolling Hills Plaza was occurring independent of the existence of BreakZone.

In a supplement to the agenda item for the planning commission hearing, staff advised the planning commissioners that the uses requested by Break-Zone required a CUP pursuant to the Torrance Municipal Code.[4] Staff recommended denial of the application.[5]

---

[4]In the agenda item prepared by the staff, the staff indicated that BreakZone had recently moved to its present location when other buildings in the Rolling Hills Plaza were demolished. The report described the current operation as an "existing pool [billiard] operation" and described the application as a request to augment that operation by offering full alcoholic beverage service, food service and arcade games and establish a tobacco shop. The staff report notes that "service of alcoholic beverages, full food service (restaurants) and arcade business, based on the past history of incidents, would be incompatible with the surrounding business [sic]. Staff has received correspondence from a neighboring tutoring school and from a nearby resident, in opposition to the application (attachment No. 8)." Staff proposed three findings of fact for the action of denial: (1) the use would not be compatible with surrounding uses, (2) the noise from the proposed eating patio would create a nuisance, and (3) the unusual number of police contacts would indicate the proposed use would be detrimental. In the event the project were approved, staff recommended certain conditions, including forbidding live entertainment and loudspeakers on the patio and limiting the hours of operation of the business.

[5]The five reasons for denial were: "(A.) The proposed use would not be compatible with surrounding land uses because of the proposed late hours of operation in association with the sale of alcoholic beverages which may create undesirable levels of noise and activity in close proximity to single family residential properties. [¶] (B.) The proposed use would be detrimental to the public interest because the application includes a request for amplified sound in an exterior patio located approximately 100 feet from single family residences. [¶] (C.) The proposed use would be detrimental to the public interest because of the unusual number of Police Department contacts associated with the existing business. [¶] (D.) That the introduction of on-premise consumption of alcoholic beverages would be detrimental to the

The hearing before the planning commission was scheduled for November 5, 1997. On the date set for hearing, 29 persons filed requests to speak before the planning commission in connection with this agenda item.

The public hearing on the BreakZone agenda item began with an opening statement by one of the two counsel for BreakZone in which he introduced the owners of BreakZone, which he described as a family-owned business and the sole source of income for its owners, both of whom work at the location. There was discussion of the conditions to the granting of a CUP which had been prepared by commission staff. In the course of this discussion, counsel for BreakZone advised the commission that his client did not plan to have live entertainment with the exception of pool exhibitions by professional players on the weekends. He acknowledged that the owners were also concerned with security and offered to work out a means of responding to the concerns of the nearby private school. Each co-owner addressed the commissioners and responded to questions, after which members of the public presented their views.

The first speaker stated that her bedroom windows were 75 to 100 feet from the BreakZone premises. She also worked at the plaza and had many opportunities to observe the noise and misbehavior of people in the parking lot adjacent to BreakZone. In her experience, BreakZone's efforts at security were ineffective. She presented security reports from Rolling Hills Plaza, including one of an incident in which it was asserted that employees of BreakZone were not permitted to call 911 unless Boyd approved. (Boyd later denied that the policy on emergency calls was as represented.) A second neighbor was concerned that serving alcohol would attract people who came to drink rather than an "upscale" clientele. Other neighbors complained about noise coming from the vicinity of BreakZone after midnight. One patron testified that BreakZone was a good location for teenagers now, but permitting alcohol would detract from the safe atmosphere.

The owner of the private school testified that a pool hall next to the school presented a problem. He had observed BreakZone customers loiter in front of the school, leave broken bottles and harass school employees and students. The school had no such problems before BreakZone moved next door.

In support of the application, a pool teacher at BreakZone testified that she is there almost every night and has never observed problems and never

public interest in that the fundamental nature of the existing business would be altered from a family orientation to an adult focus, with the food service of the use located in the ground level sports bar, outside and separate from the family billiards area. [¶] (E.) That the proposed modifications would be detrimental to the public interest and to the property of persons in the area because the change allocates only approximately 24% of the floor area of the use for family billiards, while the existing use allows 100% of the floor area for family billiards."

felt at risk going to her car. Patrons testified to the positive atmosphere and of feeling safe going to and from BreakZone.

Lieutenant Dennis Addington, commander of the vice and narcotics division of the Torrance Police Department, told the commissioners that some of the persons who frequent BreakZone are gang members and the parking lot is considered to be a gathering spot for gang members. In his view, serving alcohol would increase the problems at BreakZone even though BreakZone's intention is to make BreakZone into an "upscale business." He advised the commissioners that the increase in police contacts in the parking lot over the years can be attributed to other sources, including movie theater patrons, rather than to BreakZone. He also stated that problems in addition to those which had previously occurred would occur if alcoholic beverages were allowed.

A second counsel for BreakZone advised the commissioners that, in her view, the method by which the police department gathered incident reports unfairly linked incidents to the nearest business address even when that business had no connection with the incident. She discussed the materials previously provided by the police department. In her view, the BreakZone address had been used for events which had occurred in the parking lot and which were in no way related to BreakZone or to its customers. She commented that other businesses in the center probably had drawn the offenders to the lot near BreakZone. She cited testimony at a deposition by a Torrance police officer that there had been no proven connection between gang members at BreakZone and crime. Counsel for BreakZone disputed that the prior problems were the result of BreakZone's presence and noted that other businesses in the immediate vicinity already sell alcoholic beverages.

The public hearing lasted approximately one and one-half hours. During deliberations after closing the public hearing, the commissioners added conditions to the CUP, after which they approved the project on a four-to-one vote.

On November 19, 1997, Councilman Dan Walker filed an appeal of the November 5, 1997 decision of the planning commission. The portion of the City of Torrance "Appeal Form" headed "Reason for Appeal"[6] contains the following statement: "Based upon Police Department recommendation, this

---

[6]Next to the words "Reason for Appeal" are these instructions: "Be as detailed as necessary. Additional information can be presented at the hearing. Attach pages as required with additional information and/or signatures."

decision is being appealed in order to bring the matter in front of the entire Council."

The appeal was scheduled for hearing at the January 20, 1998 meeting of the city council. The agenda item prepared for that hearing, dated January 8, 1998, advised the council members that the planning commission had recommended denial of the appeal and that the planning director recommended approval of the appeal and denial of the project.

Included in the agenda item were 22 "serious incident reports" prepared by Wells Fargo Guard Services which provided security at the Rolling Hills Plaza and letters dated prior to BreakZone's application from local residents, the adjacent City of Lomita and others regarding the need to construct a wall along one side of the Rolling Hills Plaza to help control noise from the development.

The agenda item advised the council that BreakZone had recently moved from one location in the center to another as a result of remodeling the center and that if the CUP were granted and its plan implemented, BreakZone would be "much greater in scope" than the current arrangement of a "small snack bar" and "billiards hall."

One week prior to the city council hearing date, BreakZone submitted a written response to the Wells Fargo security incident reports. In its response, BreakZone's attorneys stated: "It would be unfair to deny BreakZone the right to sell alcoholic beverages when the Planning Commission has recently given approval to many other restaurants within the plaza to make such sales. . . . Alcoholic beverages are currently sold throughout Rolling Hills Plaza. . . . BreakZone is one of the few entertainment businesses within the plaza that does not currently sell alcoholic beverages, so the persons drinking must have been customers of other business [sic] within the plaza, or elsewhere." BreakZone stated that there were 22 incidents and that the reports had been submitted in duplicate to the planning commission. Its analysis of the reports was that only three of the incidents occurred inside BreakZone and that those which occurred in the parking lot outside could not be attributed to it.

On January 15, 1998, BreakZone submitted two documents to the Torrance city clerk: (1) a "Request for Recusal of Council Members" and (2) a "Request for Withdrawal of Appeal." By the request for recusal, BreakZone asked that council members Dan Walker, George Nakano, Maureen O'Donnell and Don Lee recuse themselves from participation in the appeal of its application for a CUP. BreakZone gave two reasons for its request. As

to all named council members, BreakZone stated that each had received "significant campaign contributions" from entities owned by Mr. Norman La Caze (La Caze), the developer of the plaza in which BreakZone was located, and that La Caze had a direct interest in having the planning commission's decision overturned as that action would assertedly reduce the damages recoverable by BreakZone in its litigation then pending against La Caze interests. In addition, it was alleged that La Caze and the entities he controlled had a significant interest in influencing the council to overturn the planning commission determination.[7]

BreakZone also asserted in this document that Dan Walker "has already exhibited bias on this matter by filing the Notice of Appeal. Therefore, he should not participate as a decision maker in connection with his own appeal."

BreakZone premised its request for withdrawal of appeal on two grounds: (1) The notice of appeal "does not comply with Torrance Municipal Code section 11.5.2(a)(4)" and (2) "the Notice of Appeal was filed by a council member who has a conflict of interest on this issue."

In support of the first ground, BreakZone argued that the notice "does not provide BreakZone Billiards with notice as to what Mr. Walker's concerns are, or how they may be addressed." In support of the second ground, BreakZone stated that Walker had received campaign contributions in the

---

[7]BreakZone attached copies of Fair Political Practice Commission disclosure forms listing contributions received by the campaign committees of the council members, from La Caze or "entities he controls," as follows:

| Council Candidate | Date | Contributor | Amount |
|---|---|---|---|
| Walker | 3-8-96 | Rolling Hills Plaza | $1,000 |
| | 3-8-96 | La Caze Development | 500 |
| | 8-23-96 | Rolling Hills Plaza | 1,000 |
| | 8-23-96 | K/B Rolling Hills Plaza | 1,000 |
| | 8-23-96 | La Caze Development Co. | 2,000 |
| O'Donnell | 2-22-96 | Rolling Hills Plaza | 1,000 |
| Lee | 11-25-95 | Rolling Hills Plaza | 500 |
| Nakano | 2-16-95 | La Caze Development Co. | 200 |
| | 2-1-96 | Rolling Hills Plaza | 750 |
| Hardison | 1-2-94 | La Caze Development Co. | 100 |

On March 30, 1996, Maureen O'Donnell (whose occupation was listed as "teacher") is listed in Walker's disclosure statement as giving him $1,000. In the reporting period ending June 30, 1994, O'Donnell reported giving Walker $950.

Also in the materials submitted by BreakZone were copies of two leases between Rolling Hills Plaza and the owners of BreakZone. The then current lease provided for payment of a fixed rental upon completion of specified developments in the center and for downward adjustment in the rent in the event no liquor license was obtained.

amount of $5,500 from "entities controlled by Norman La Caze during the year 1996." It further argued that the litigation between BreakZone and La Caze gave La Caze a "direct and significant financial interest in having the Planning Commission decision overturned."

In a January 20, 1998 supplement to the agenda item for that evening's appeal hearing, city staff transmitted BreakZone's two documents to the members of the council together with a letter in opposition to the application from the school principal who had also testified before the planning commission.

At the January 20 council meeting, BreakZone submitted a document entitled "Response by BreakZone to Appeal by Councilman Walker," in which BreakZone advised the council why the appeal should be rejected and Walker and others disqualified from hearing the matter. The police chief submitted to council members that evening a memo transmitting a list of "approximately 24 calls for service" at BreakZone's address.

The matter was continued to February 10, at the request of the city attorney, so he would have time to review the materials received that evening and advise the council on the contents of BreakZone's "Response," which he had not seen earlier. The council declined the request of Break-Zone's counsel to hear the comments of those persons who had attended the meeting and wished to speak to the appeal, preferring to have them testify at the next date.

By letter dated February 2, 1998, BreakZone's counsel objected to the council considering matters outside the planning commission record except for giving BreakZone the opportunity to comment on matters raised for the first time at the planning commission hearing. BreakZone asked to be advised of the "standard of review" which the council would use and which party had the burden of proof for the CUP. BreakZone also objected to consideration of the additional information from the police department and the comments of the neighboring tenant, the school principal. BreakZone asked that those items be withdrawn from the record.

In a separate letter the same day, BreakZone asked that its hours of operation, which the planning commission had modified as a condition to granting the application, be extended. BreakZone's counsel submitted a third letter responding to the information submitted to the council on January 20, from the chief of police, without waiving its contention that the additional information should not be received.

On February 10, the new date for the hearing, 21 people filed cards asking to speak on the matter of BreakZone's application for a CUP. The hearing

began with the city attorney addressing procedural and other issues raised by BreakZone in its correspondence. The city attorney advised the council that no council member was disqualified from participation in this matter by reason of receipt of the designated campaign contributions; Councilmember Walker was not barred from participating because he had filed the appeal; he had done so in accord with the Torrance Municipal Code; city representatives had met with the attorneys for BreakZone and discussed issues including the proper scope of hearing (the proper scope of the evening's hearing was de novo); and city representatives had advised counsel for BreakZone that, as the applicant, BreakZone had the burden of persuading the council that its application for the CUP should be granted.

The four council members whose participation had been challenged in the request for recusal each acknowledged receipt of campaign contributions and stated that circumstance would not affect their consideration of, or vote on, the application. Councilmember Walker further stated that he had filed the appeal because of significant community concern; he had met with counsel for BreakZone to discuss the matter; he had not already determined how he would vote; and he would give the matter a fair hearing. He also stated he intended to hear the appeal with an open mind and make his "decision based upon the facts and the law."

Councilmember O'Donnell stated she had voted against La Caze's projects in the past and had not spoken to La Caze in more than a year.

Mayor Hardison, who had not been listed in the body of the request for recusal, disclosed that she had received $100 of $50,000 which she had raised four years earlier from La Caze entities and stated she could be fair and impartial.

The factual presentation began with the Torrance senior planner outlining the application for CUP to the council. He highlighted that the significant changes which would be made were embodied in the requests for full alcohol and food service and utilization of an adjoining outside patio for dining and for amplified music. Torrance Police Lieutenant Addington then discussed the history of police activity in the vicinity of BreakZone. Addington displayed an overhead of police calls between November 7, 1992, and February 6, 1998, which listed 124 calls for service in that period. These were all calls in which the BreakZone address was used to identify the incident. The first call referenced, in 1992, was for attempted murder. Two subjects turned away from BreakZone by its security guard as suspected gang members later got into a fight with a person who had left BreakZone;

they stabbed him four times, leaving him near death. In the February 6, 1998 call, a fight broke out in front of the location following an exchange of gang signs after a traffic incident. Addington also summarized calls which had occurred inside BreakZone, including a fire in a restroom for which Break-Zone was listed as the victim. At the conclusion of his presentation, and in response to a question by the city attorney, Addington advised the council that the fact that a call was listed with BreakZone's address did not mean that it was "directly attributable to the fact that the BreakZone is there . . . ."

Counsel for BreakZone made a presentation, noting their client's differing view of the scope of the hearing and the burden on BreakZone. Their view was that the hearing that evening was to address the question: Did the planning commission err? Counsel for BreakZone also asked that its hours of operation, as modified by the planning commission when it approved the CUP, be reconsidered. Counsel noted that 18 other establishments in the Rolling Hills Plaza were then selling alcohol in some form. BreakZone co-owner Boyd addressed the council and told of plans to accommodate young people and families in an "upscale" facility with a nice restaurant. She intended to continue the BreakZone youth card so that people aged 16 to 18 could play until 10:00 p.m. without adult supervision. Co-owner Chartier advised the council that he had been in business a total of 30 years. From the establishment of BreakZone, his goal had been to provide a safe atmosphere. For this reason he had always had security personnel and cameras inside the location. BreakZone also enforced certain rules that customers must follow, or be expelled.

Testimony from the public was split. Customers and employees of Break-Zone testified to its safe and enjoyable atmosphere and to the integrity and experience of its owners. One customer said she would frequent it more often if alcoholic beverages were available. Another customer asked the council members not to attribute all police incident reports which utilized BreakZone's address to circumstances at BreakZone or to the fact of its presence.

Residents of the adjacent neighborhood objected to expansion of Break-Zone, one stating that service of alcohol or allowing use of the adjoining patio would only exacerbate problems the residents had been having. Parents of children attending the adjacent private school were fearful that granting the CUP would only exacerbate their concern for the safety of their children. They had encountered increased problems since Breakzone had moved to its new location within the plaza.

Later in the course of the hearing, one counsel for BreakZone gave a detailed reply to the police department presentation, concluding that only three of the police incident reports could be properly attributed to Break-Zone. She advised the council that allowing service of alcoholic beverages was crucial to BreakZone's economic viability, a point later seconded by Chartier.

Addington advised the council that the police department believed that BreakZone was a hangout for particular gang members. In his opinion, 27 of the police incident reports which he had described to the council earlier that evening were significant.

During discussion by the council after the close of the public hearing, Councilmember Walker noted that BreakZone was attracting and ejecting people, who then loitered outside. In his view a liquor license would only make that problem worse. Councilmember Hardison expressed concern about the proposal to change the type of business from its original scope, stating that the operation proposed was too close to residences and should not be allowed to expand.

Councilmember Lee was of the view that the current operation was appropriate, and that the application should be viewed as a request to add to something, not take something away. Lee saw no reason to add to the problems in the area; BreakZone's orientation toward serving youth should continue. Permitting sale of alcoholic beverages would detract from this focus. Another council member saw the proposal as contradictory; that BreakZone wanted to run a youth program, but permit alcohol.

BreakZone responded by telling the council that it could not survive on youth business alone. It did not ask that the council approve the plan without permitting the service of alcohol; it considered the ability to serve alcoholic beverages critical to its future financial success. Boyd offered to "bend over backwards" to accommodate neighbors' concerns so that BreakZone could implement its original plan.

Before the vote on the matter was taken and in response to a question from the mayor, the city attorney advised the council that it could approve the CUP with certain conditions.

The council then voted unanimously to grant the appeal and deny the application for the CUP. At its March 17, 1998 council meeting, the council formally adopted the resolution approving the appeal and denying the CUP. All council members present voted in favor (absent were members Lee and

Nakano). On April 24, 1998, BreakZone filed a timely petition for peremptory writ of administrative mandamus pursuant to Code of Civil Procedure section 1094.5.

The superior court denied BreakZone's application for a writ of mandate. The appeal to this court was timely filed.

## CONTENTIONS

BreakZone contends it was denied a fair hearing for these reasons: (1) the notice of appeal of the determination of the planning commission failed to give adequate notice of the grounds for appeal; (2) the Torrance Municipal Code did not give BreakZone notice of the scope of review by the city council of the appeal from the Torrance Planning Commission's approval of BreakZone's application for a CUP or establish who bore the burden of proof; (3) four members of the city council were biased because they had received campaign contributions from the developer and lessor of the property for which BreakZone had applied for a CUP; (4) a member of the city council had filed the appeal of the planning commission's decision and participated in and voted on the appeal; (5) the Torrance City Attorney improperly advocated on behalf of the council member who had filed the appeal; (6) matter was presented at the city council hearing on the appeal which had not been presented at the planning commission hearing; and (7) the cumulative effect of all of the alleged breaches of due process was an appearance of bias.

BreakZone also contends the determination of the city council granting the appeal and denying the application is not supported by substantial evidence.

## DISCUSSION

1. *Adequacy of the notice contained in the notice of appeal.*

The Torrance Planning Commission granted BreakZone's application for a CUP by which BreakZone sought to substantially expand the nature of its operation, from a 16-table billiard parlor catering to youths to a much larger billiard parlor with full food service, and which would serve alcoholic beverages, redirecting its focus for clientele from juveniles to adults. The application for a CUP was granted on November 5, 1997. On November 19, Councilmember Don Walker filed a notice of appeal.

 BreakZone contends that the notice of appeal which Walker filed did not comply with section 11.5.2(a)(4) of the Torrance Municipal Code[8] or otherwise give adequate notice to BreakZone of the basis of the appeal. BreakZone also contends it was not notified which party had the burden of proof.[9] In making these contentions, BreakZone argues that the asserted lack of adequate notice meant that BreakZone was "put in the unfair position of having to defend the Planning Commission's decision against all possible attacks."

There is a fundamental error in BreakZone's premise. Although it is styled as an "appeal" of the decision of the planning commission, a hearing before a city council on an application for a CUP after hearing by a planning commission is a proceeding de novo.[10] That this is so is established by a venerable line of cases, including *Russian Hill Improvement Assn. v. Board of Permit Appeals* (1967) 66 Cal.2d 34, 46 [56 Cal.Rptr. 672, 423 P.2d 824]; *McDonald's Systems of California, Inc. v. Board of Permit Appeals* (1975) 44 Cal.App.3d 525, 539 [119 Cal.Rptr. 26]; *Lagrutta v. City Council* (1970) 9 Cal.App.3d 890, 895 [96 Cal.Rptr. 627]; and *Anderson v. Pittenger* (1961) 197 Cal.App.2d 188, 195 [17 Cal.Rptr. 54]. As such, the burden is on the applicant to establish to the satisfaction of a majority of the city council that the application should be approved. As a de novo hearing, all issues are before the reviewing body, in this case the city council.[11]

---

[8]Section 11.5.2(a) of the Torrance Municipal Code provides: [¶] "The notice of appeal shall contain the following information in addition to the information given by the applicant thereon or reasonably required by the City Clerk therefor: [¶] 1) The name, address, and telephone number of the applicant. [¶] 2) The type of permit desired or action requested. [¶] 3) The date on which said permit was issued or refused or the decision was made and the name of the City officer, body, or department taking such action. [¶] 4) The grounds on which the appeal is taken."

[9]We interpret this second contention as an inquiry into which party had the burden of persuasion on the application for a CUP at the hearing before the city council.

[10]There are exceptions to this rule. The exception applicable in this circumstance would be created by a local ordinance which provided for a different standard of review. That was the circumstance presented in *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547 [35 Cal.Rptr.2d 782] (*Cohan*). There, Thousand Oaks Municipal Code section 1-4.04 required that "the appellant shall show cause on the ground specified in the notice of appeal why the action appealed from should not be approved." There is no similar provision in the Torrance Municipal Code that has been cited by the parties. Accordingly, the general rule of de novo review would apply. The fundamental characteristic of de novo review is that all issues are subject to review.

[11]In *Cohan, supra,* 30 Cal.App.4th 547, Division Six of this court considered a due process objection made to an appeal which the Thousand Oaks City Council had taken to itself of a subdivision map act approval made by its planning commission. That appeal was never reduced to writing. In commenting on the procedural errors evident on the facts of that case, the court suggested that applicants had a right to know what they needed to prove. The issue

Further, the notice of appeal meets the requirement of law. The notice requirements applicable to appeals are set out at section 11.5.2 of the Torrance Municipal Code.[12] The key provision of section 11.5.2 is subsection (a)(4) which requires a statement of "The grounds on which the appeal is taken." BreakZone contends that the statement of grounds provided by Walker was insufficient.

Walker filed his notice of appeal on a form provided by the city. That form contained a section headed "Reason for Appeal." In that section, Walker put the following: "Based upon Police Department recommendation, this decision is being appealed in order to bring the matter in front of the entire Council."

By this statement, Walker communicated the facts that (1) in his view, the full city council should hear and decide the question of granting the application filed by BreakZone, (2) an agency of the City of Torrance charged with public safety had recommended denial of the application, and (3) this circumstance was of substantial concern.

BreakZone had had notice of the objections of the police department for several months before the appeal was filed and had addressed those objections specifically before and during the November planning commission hearing. Given the facts that the application was BreakZone's, its principals and attorneys had been present at the planning commission hearing and had been in frequent contact with representatives of city government concerning issues arising in its application, as well as the long-standing rule that appeals are considered de novo, we conclude that BreakZone had adequate notice of the nature of the proceeding before the city council: The data contained in the notice of appeal was sufficient notice to BreakZone that it must make its case to the Torrance City Council or face reversal of the planning commission ruling.

BreakZone errs when it contends that *Cohan, supra,* 30 Cal.App.4th 547, states a different rule. In *Cohan,* the City Council of the City of Thousand

had arisen because the city council had never specified exactly what action it was to consider—as there had never been a written notice of appeal filed. (*Id.* at p. 557.) The circumstances of *Cohan* differ greatly from those of the instant case in which there was a written appeal filed which contained a statement of reasons. We note also that the long line of cases applicable to review of CUP's makes clear what is to be proven and by whom on the de novo review that occurs when a planning commission determination on a CUP is appealed to the reviewing body. Also in contrast to the actions of the city council in *Cohan,* in the instant case, the party who filed the appeal and the city council complied with relevant provisions of the Torrance Municipal Code. (See discussion in pt. 4, *post.*)

[12]The text of this section is set out in footnote 8, *ante.*

Oaks voted to waive the provisions of the Ralph M. Brown Act (the Brown Act; Gov. Code, § 54950 et seq.) and appeal to itself a decision of its planning commission which had approved a subdivision map under the Subdivision Map Act (Gov. Code, § 66410 et seq.). The council never filed a written appeal. In so acting, that city council violated not only the Brown Act (which violation was not sufficient to invalidate its subsequent action), but its own municipal code, which required that any appeal of a decision of its planning committee must be in writing, as well as the similar provision of Government Code section 65094. (30 Cal.App.4th at p. 556.) In the instant case, there is no similar ordinance. Rather, the applicable ordinance prescribes that there be a written statement of appeal with grounds, requirements with which the appellant complied.

BreakZone cites no authority which compels or suggests that the Torrance appeal process is fundamentally unfair. BreakZone's citation of *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434 [282 Cal.Rptr. 819] is also inapposite. In *Rosenblit*, the physician had been provided with a notice which charged him with poor clinical judgment in 30 cases. The notice was generated by the hospital, not the physician, and the cases were listed numerically in the notice, without any indication as to the alleged deficiencies. In an attempt to determine the basis for the charges, the physician requested permission to copy the medical charts of the assertedly problem cases. That request was denied. The Court of Appeal ordered that the hospital give the doctor access to the records on which it based its allegations.

By contrast, in the instant case, BreakZone was fairly apprised of the scope of the hearing, was the initiator of the application for a CUP, had prepared its case over many months, received background and other materials from the city, and had participated in a hearing before the Torrance Planning Commission at which those issues were aired. It was the decision of that commission which was being appealed to the city council. While no party can fully anticipate what issues may be raised at a public hearing on a CUP, BreakZone had substantial knowledge of the facts and issues at hand concerning its request to expand the scope of its own business.[13]

BreakZone's citation of *Carey v. Piphus* (1978) 435 U.S. 247 [98 S.Ct. 1042, 55 L.Ed.2d 252] is misplaced. While Code of Civil Procedure section 1094.5 mandates that an applicant for a CUP receive a fair hearing (*Applebaum v. Board of Directors* (1980) 104 Cal.App.3d 648, 657-658 [163

---

[13]We note BreakZone's contention that it did not learn until the February 10, 1998 hearing that the City of Torrance had not fully complied with BreakZone's July 1997 Public Records Act request; this is discussed in part 6, *post.*

Cal.Rptr. 831]),[14] it does not automatically follow that the federal due process clause is always implicated.

The municipal code and the common law vested in the Torrance City Council discretion in review of individual applications for CUP's in imposing conditions on such permits, and in denying permits. BreakZone had no property right to a CUP. In considering applications for such permits, a city is obligated to examine permit applications on an individual basis, applying sound principles of planning and zoning administration in a fair manner. A CUP is discretionary by definition. (*Smith v. County of Los Angeles* (1989) 211 Cal.App.3d 188, 197 [259 Cal.Rptr. 231].) An applicant is not entitled to a building permit merely because it complies with building codes. (*Guinnane v. San Francisco City Planning Com.* (1989) 209 Cal.App.3d 732, 736 [257 Cal.Rptr. 742].) Applying this reasoning, Division One of this court has held that there is no federally protected property interest on which to base a claim of denial of procedural due process under such circumstances. (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1183 [56 Cal.Rptr.2d 223].) Because there is no due process right, our analysis is limited to whether BreakZone was afforded a fair hearing before the Torrance City Council, including fair notice. (*Ibid.*) For the reasons discussed, *ante*, we hold that the notice given was sufficient.

2. *Notice of the burden of proof and of the type of hearing.*

In a closely related argument, BreakZone contends that it was denied a fair hearing because the Torrance Municipal Code does not define the burden of proof or the type of hearing to be held before that city's city council on the hearing of an appeal of any action of the planning commission regarding a CUP.

We noted in connection with BreakZone's first contention that the rules in this area are long-standing. At the de novo hearing before the city council on the "appeal" of an application for a permit, the applicant bears the burden of demonstrating its entitlement to the permit. This standard was confirmed by our Supreme Court more than 33 years ago in *Russian Hill Improvement Assn. v. Board of Permit Appeals, supra,* 66 Cal.2d at page 38, and has been the subject of numerous published opinions since then, including *Topanga*

[14]Code of Civil Procedure section 1094.5 provides in relevant part: "(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

*Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 521 [113 Cal.Rptr. 836, 522 P.2d 12] (denial of variance is a legislative rather than adjudicative function); *Gabric v. City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 191 [140 Cal.Rptr. 619]; and *Lagrutta v. City Council, supra,* 9 Cal.App.3d at page 895.

As respondent points out, BreakZone was aware of its obligation not later than the beginning of the February 1998 city council meeting. Thus, at the beginning of that hearing, the city attorney stated that the council was going to consider the matter de novo. Further, counsel for BreakZone and the city had met several days prior to that hearing and the city attorney had made clear then that "every issue associated" with the pending application would be before the council for consideration.

Nor is BreakZone's contention supported by the applicable local ordinance. The section of the Torrance Municipal Code that concerns hearings before that city council on appeals provides that the entire application shall be under review. Section 11.5.4 of that code, headed "Hearing Before Council," states in part: "The Council shall hold a hearing. . . . The Council may summon witnesses and hear evidence relating to *such application.* . . . At the conclusion thereof, the Council shall grant or deny such application or make such modifications of the decision or action appealed from with reference thereto as it may deem fit. . . ." (Italics added.)

BreakZone's citation to *Cohan, supra,* 30 Cal.App.4th 547 is inapposite. We have discussed, *ante,* the significant factual differences between that case and this one and the long-standing common law determination regarding the scope of hearing and the burden of proof required in support of an application for a CUP. Even assuming, arguendo, that the rationale of *Cohan* applied, the fact that the Torrance City Attorney met with BreakZone's counsel several days prior to the hearing, and explained the rules that would be followed, distinguishes this case from *Cohan.* Certainly there is not present the total lack of notice that was evident in *Cohan,* or the lack of disclosure of facts in possession of the adjudicatory body that was the factual basis for the court's ruling in *Rosenblit.* Further, the City of Torrance provided actual notice to BreakZone's counsel prior to the hearing. The contention is without merit.

3. *Was the impartiality of the decision makers impermissibly tainted by the campaign contributions?*

BreakZone contends that the receipt of campaign contributions by four members of the Torrance City Council deprived BreakZone of a

decision by an impartial tribunal, thus depriving BreakZone of a fair hearing.[15]

a. *Facts.*

On January 15, 1998, BreakZone filed its request for recusal of council members (the Request) with the Torrance city clerk. In that request, Break-Zone alleged that four members of the Torrance City Council, Don Lee, George Nakano, Maureen O'Donnell and Dan Walker, had received "significant campaign contributions" from entities owned by La Caze, the developer of the Rolling Hills Plaza and lessor of the site of BreakZone. BreakZone further alleged that La Caze had a direct interest in overturning the November 1997 decision of the planning commission. That interest was alleged to stem from litigation then pending between BreakZone and La Caze. Break-Zone alleged denial of the CUP would substantially reduce the damages which BreakZone might recover in that lawsuit.[16] BreakZone attached to the Request copies of campaign contribution reports filed by each of the four council members for earlier periods of time, and a copy of BreakZone's leases with Rolling Hills Plaza. A chart summarizing the campaign contribution data appears in footnote 7, *ante.*

In advancing these contentions, BreakZone places reliance on the self-interest of its landlord, arguing that the campaign contributions made by La Caze 17 months and more prior to the February 1998 council action overturning the planning commission's approval of BreakZone's application for a CUP create the appearance of bias and a "common law" conflict of interest.[17]

BreakZone does not allege that any council member had any present interest in the CUP, or in the development in which the premises are located. Nor does BreakZone allege any other financial interest, direct or indirect, on the part of any member of the city council.

---

[15]BreakZone forms this contention as a violation of due process. For the reasons discussed in this opinion, *ante,* any violation would be of BreakZone's right to a fair hearing, rather than to due process.

[16]BreakZone also alleged that "Walker has already exhibited bias on this matter by filing the Notice of Appeal." We consider that contention in part 4, *post.*

[17]Review of the 1996 lease amendment between BreakZone and Rolling Hills Plaza Venture 96, LLC, which BreakZone attached to the Request, reveals that this lease provides for a fixed rent of $1.50 per square foot for the ground floor and $.75 per square foot for the mezzanine upon completion of specified tenant improvements and for reductions to $1.03 and $.50 per square foot, respectively, if a liquor license cannot be obtained within a specified period of time. These facts permit the inference that it was in La Caze's financial interest to support the application for a CUP.

BreakZone clearly bases its assertion of conflict of interest upon the campaign contributions received by four of the members of the city council at least 17 months earlier. The record does not permit us to verify Break-Zone's contention that it was in La Caze's financial interest to oppose the CUP. Nor are there any facts to support an inference that any council member had any present interest in the CUP, direct or indirect. On this record, as we discuss in the following parts, the facts and the law compel the conclusion that BreakZone's contention is without support.

### b. *The Political Reform Act.*

The Political Reform Act (Gov. Code, § 81000 et seq.) creates a statutory obligation on the part of a public official to whom that act applies not to vote on a matter if he or she has received campaign contributions from a donor aggregating $250 or more within 12 months prior to the time the decision is made.[18] This prohibition does not encompass third parties who may hold the

---

[18]Government Code section 87103 provides in part:

"A public official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on the official, a member of his or her immediate family, or on any of the following:

"(a) Any business entity in which the public official has a direct or indirect investment worth one thousand dollars ($1,000) or more.

"(b) Any real property in which the public official has a direct or indirect interest worth one thousand dollars ($1,000) or more.

"(c) Any source of income, other than gifts and other than loans by a commercial lending institution in the regular course of business on terms available to the public without regard to official status, aggregating two hundred fifty dollars ($250) or more in value provided to, received by or promised to the public official within 12 months prior to the time when the decision is made.

"(d) Any business entity in which the public official is a director, officer, partner, trustee, employee, or holds any position of management.

"(e) Any donor of, or any intermediary or agent for a donor of, a gift or gifts aggregating two hundred fifty dollars ($250) or more in value provided to, received by, or promised to the public official within 12 months prior to the time when the decision is made. The amount of the value of gifts specified by this subdivision shall be adjusted biennially by the commission to equal the same amount determined by the commission pursuant to subdivision (f) of Section 89503.

"For purposes of this section, indirect investment or interest means any investment or interest owned by the spouse or dependent child of a public official, by an agent on behalf of a public official, or by a business entity or trust in which the official, the official's agents, spouse, and dependent children own directly, indirectly, or beneficially a 10-percent interest or greater."

Government Code section 87103, subdivision (e) requires that contributions received within the 12 months prior to the vote be aggregated to determine if the financial threshold for disqualification from participation has been reached. Although BreakZone alleged in its request for recusal that four members of the Torrance City Council had received financial

same views as the donor or who might benefit from the action before the public official.

The concept that campaign contributions perpetually disqualify the recipient from participating in governmental decisions has been expressly and emphatically rejected by our Supreme Court. In *Woodland Hills Residents Assn., Inc. v. City Council* (1980) 26 Cal.3d 938 [164 Cal.Rptr. 255, 609 P.2d 1029] (*Woodland Hills*), the court rejected a contention that the fair hearing mandate of Code of Civil Procedure section 1094.5 means that city council members who receive campaign contributions from parties having a financial interest in a matter before a city council are disqualified in perpetuity from considering and voting on a matter affecting a campaign contributor. (26 Cal.3d at pp. 944-946.) After noting that the Political Reform Act limits the proscription on voting on such matters to a 12-month period after the receipt of a disqualifying amount of contributions, our Supreme Court stated: "To disqualify a city council member from acting on a development proposal because the developer had made a campaign contribution to that member would threaten constitutionally protected political speech and association freedoms.

"Governmental restraint on political activity must be strictly scrutinized and justified only by compelling state interest. (*Buckley v. Valeo* [(1976)] 424 U.S. 1, 25 [96 S.Ct. 637-638, 46 L.Ed.2d 659, 691].) While disqualifying contribution recipients from voting would not prohibit contributions, it would curtail contributors' constitutional rights. Representative government would be thwarted by depriving certain classes of voters (i.e., developers, builders, engineers, and attorneys who are related in some fashion to developers) of the constitutional right to participate in the electoral process.

"Public policy strongly encourages the giving and receiving of campaign contributions. Such contributions do not automatically create an appearance of unfairness. Adequate protection against corruption and bias is afforded through the Political Reform Act and criminal sanctions. (Pen. Code, § 165; see also Pen. Code, § 67 et seq.)" (*Woodland Hills*, *supra*, 26 Cal.3d at pp. 946-947, fn. omitted.)

The text of footnote 9 of *Woodland Hills,* is particularly instructive: "Plaintiffs' contention might well be self-defeating should they prevail. If a

---

contributions, it never alleged that the contributions received by any individual council member, in the aggregate, exceeded the threshold for application of section 87103 within 12 months prior to the vote in question. Review of the contributions made as presented by BreakZone shows that, within 12 months prior to the council's action on February 10, 1998, no member of the city council had received any financial contribution from La Caze. Accordingly, there was no violation of the Political Reform Act. (See fn. 7, *ante*.)

political contribution automatically disqualifies the recipient after his election from considering and acting on matters in which the contributor has an interest, the enterprising developer could disqualify all known environmentalists who are running for municipal office by making nominal contributions to the campaign committees of such persons. Future applications of the developer could then be judged by a panel from which all known environmentalists have been disqualified." (26 Cal.3d at p. 947, fn. 9.) The same strategy might be employed by any interest group.[19]

Thus, a fair hearing is not precluded by the circumstance that an interested party makes campaign contributions to members of the agency which will adjudicate its claim, and does so more than 12 months prior to action by the members of that agency who receive those contributions. Rather, public policy strongly encourages the giving and receiving of campaign contributions. Such actions are constitutionally protected and do not automatically create an appearance of unfairness.

Assuming, arguendo, that there were a cognizable inquiry that could constitutionally be made based on the fact of campaign contributions having been made, there are significant unanswered questions of causation and relationship in this case. For example, there are no facts in the record which suggest the significance of the contributions by La Caze to the campaigns of the council members who voted on the application, or to the current "alignment" of La Caze with any of these, or other, council members; whether campaign contributions of others would have an impact on the issue under consideration; or the nature and significance of interests of third parties (e.g., other lessees in the development) in this CUP application and whether any of those interested parties had made campaign contributions to any of the council members.

 c. *Government Code section 1090.*

The Political Reform Act does not preclude the application of other laws so long as those other provisions do not interfere with compliance with the

---

[19]There is no evidence in the record, other than the leases and litigation discussed in part 3a and in footnote 17, *ante,* and in the text following this footnote, to connect La Caze to the application for the CUP at issue, or to indicate how he would benefit from a vote against—or for—the application. Nor is there any evidence of whether any member of the city council received a campaign contribution from any other person who, or entity which, may have had an interest in the outcome of the application. Further, there are no other facts in the record that might give rise to an inference that La Caze or anyone else with an interest in the application, other than BreakZone and its principals, sought to influence the vote of any member of the city council. Without more, we cannot find extant the compelling state interest necessary to justify further inquiry.

Political Reform Act. (Gov. Code, § 81013.) Government Code section 1090 is the law of most general application which imposes such "additional requirements." It provides:

"Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity.

"As used in this article, 'district' means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or propriety functions within limited boundaries."

Government Code section 1090 codified the common law prohibition of public officials having a financial interest in contracts they make in their official capacities. (*Terry v. Bender* (1956) 143 Cal.App.2d 198, 206 [300 P.2d 119]; *Schaefer v. Berinstein* (1956) 140 Cal.App.2d 278, 289 [295 P.2d 113].) The purpose of this section is to prohibit self-dealing, not representation of the interests of others. It is the latter circumstance that confronts BreakZone. BreakZone contends that the recipients of political contributions voted the interest of the developer who had a history of contributing to their political campaigns. That allegation, whether true or not, is not forbidden by either Government Code section 1090 or section 87103. (See *Woodland Hills, supra,* 26 Cal.3d at pp. 946-947.)[20]

This statutory prong of the conflict of interest doctrine requires that the official have some interest in the outcome, whether direct or indirect. Where the interest is remote and speculative, no conflict of interest is held to be presented under the statute. This has been the rule since *Hotchkiss v. Moran*

---

[20]Nor is it illegal per se. Penal Code section 165 provides: "Every person who gives or offers a bribe to any member of any common council, board of supervisors, or board of trustees of any county, city and county, city, or public corporation, with intent to corruptly influence such member in his action on any matter or subject pending before, or which is afterward to be considered by, the body of which he is a member, and every member of any of the bodies mentioned in this section who receives, or offers or agrees to receive any bribe upon any understanding that his official vote, opinion, judgment, or action shall be influenced thereby, or shall be given in any particular manner or upon any particular side of any question or matter, upon which he may be required to act in his official capacity, is punishable by imprisonment in the state prison for two, three or four years, and upon conviction thereof shall, in addition to said punishment, forfeit his office, and forever be disfranchised and disqualified from holding any public office or trust."

BreakZone does not present any facts which support application of this, or any other, penal provision.

(1930) 109 Cal.App. 321, 323 [293 P. 148], in which the court rejected a claim that a conflict of interest existed from the facts that a council member who participated in a questioned transaction was the manager of a business in which a stockholder of the company receiving a contract from the city was also a stockholder. "The interest of the councilman under such circumstances is too remote and speculative . . . ." (*Ibid.*)

Further, while the interest in the outcome need not be a present interest, but may consist of a benefit which arises after the taking of the governmental action (*People v. Darby* (1952) 114 Cal.App.2d 412, 431 [250 P.2d 743]), there are no facts alleged in the instant case invoking the indirect interest rule of *Darby.* It is not sufficient that a city council member desires to advocate the position of a campaign supporter; there must be some financial or pecuniary benefit to the governmental official which could sway his or her judgment. (E.g., *Woodland Hills, supra,* 26 Cal.3d 938; *Fraser-Yamor Agency, Inc. v. County of Del Norte* (1977) 68 Cal.App.3d 201, 212-215 [137 Cal.Rptr. 118].)

BreakZone does not allege what the indirect interest is with respect to any of the council members it sought to recuse. Nor does the record contain any facts from which we can conclude that any of the four recipients of campaign contributions from La Caze would derive any personal benefit from a vote to overturn the determination of the planning commission, or demonstrate that a vote against the application for CUP would benefit La Caze.[21]

In the instant case, there is no subsequent action alleged which benefited a council member, and there is no such direct interest on the part of any participant in the CUP process. Assuming arguendo that there were a direct financial benefit to La Caze from the CUP decision made by the council at its February 10, 1998 meeting, there is no allegation that any member of the city council benefited in any manner from that decision.

d. *Common law conflict of interest.*

BreakZone argues that the history of contributions by La Caze to four sitting council members and his financial interest in the outcome of litigation between him and BreakZone "provides the appearance of unfairness and

---

[21]While BreakZone asserts that La Caze's litigation interest would be advanced by a negative vote by the council, there has been no quantification of that outcome in comparison with the grant of the application and the additional revenue to be realized by La Caze from the higher lease payments. (See fn.19, *ante.*)

bias." The existence of such unfairness, it is argued, is sufficient basis to reverse the judgment below.[22]

Analyzing BreakZone's contention requires that we answer these questions: Is there a "common law" conflict of interest doctrine notwithstanding *Woodland Hills*? Can a history of campaign contributions support a finding that a hearing in which the recipients sit as government officials make that hearing fundamentally unfair?

There is language predating *Woodland Hills* which may be read to suggest there is a common law of conflict of interest. Thus, in *Terry v. Bender, supra,* 143 Cal.App.2d 198, a case in which it was alleged that a public official had a disqualifying personal interest in a public contract, the court stated: "A public office is a public trust created in the interest and for the benefit of the people. Public officers are obligated . . . to discharge their responsibilities with integrity and fidelity. . . . [T]hey may not exploit or prostitute their official position for their private benefits. When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived of their loyal and honest services. It is therefore the general policy of this state that public officers shall not have a personal interest in any contract made in their official capacity." (*Id.* at p. 206.)

The facts of *Terry v. Bender* reveal that the public official there under scrutiny was alleged to have a direct and personal interest in the contract before that city council. (*Terry v. Bender, supra,* 143 Cal.App.2d at p. 206.) There is no similar factual allegation in the instant case and no authority cited by BreakZone can be read as establishing that a common law conflict of interest exists when the conflict is bottomed on campaign contributions made several years earlier.

[22]BreakZone also argues that the facts demonstrate that the four council members were personally involved in the matter so extensively that there was an appearance of bias. Our review of the "cold" record does not reveal support for these claims. The only obvious "embroilment" occurred at the end of the public hearing when one of the BreakZone partners accused the council of having acted unfairly. We set out in part 4, *post,* the statements by counsel for BreakZone, who expressed no such view of the hearing before the city council.

BreakZone also contends that the hearing before the council was not fair because Break-Zone "incurred their wrath" (that of the four council members) for seeking their recusal based on their acceptance of those campaign contributions. BreakZone took a calculated risk in seeking recusal when there was no clear statutory mandate that the council members in fact must recuse themselves. The face of the record does not indicate the council's decision was an act of retribution. Rather, each council member promised to be fair notwithstanding the request for recusal and their decision was supported by substantial evidence, as we shall discuss in the text in part 8.

We contrast the facts of this case with one in which it is alleged the campaign contribution is made in return for an express promise to act in a particular way in exercising governmental authority with respect to a particular matter then pending or which may be presented for governmental review and action at a later date. No such factual circumstance is alleged to exist in the instant case. (We do not foreclose a circumstance in which an earlier governmental action is "rewarded" in an illegal manner; this circumstance also is not suggested in this case.)

We have previously expressed caution over "general principles of conflict of interest." Thus, in *Friends of La Vina v. County of Los Angeles* (1991) 232 Cal.App.3d 1446 [284 Cal.Rptr. 171], we reviewed a trial court's determination that it was a conflict of interest for responses to an environmental impact report to be drafted by a consultant to an agency rather than by the agency itself. In rejecting such a contention, we stated: "Except where the law clearly provides rules for identification and rectification of what might be termed conflicts of interest, that is a legislative not a judicial function. [Citations.]" (*Id.* at p. 1456.)

We find inapposite BreakZone's citation of *Clark v. City of Hermosa Beach*, *supra*, 48 Cal.App.4th 1152. While the common law may recognize the appearance of unfairness, and provide remedies, such as writs of mandate, for allegations of denial of a fair hearing, BreakZone has not made the necessary record to invoke those protections, whether they be founded on statute or common law. We continue to be cautious in finding common law conflicts of interest. On the facts of this case, that caution is fully warranted. We reject the application of the doctrine in this case, assuming, arguendo, it exists.

4. *Did Councilmember Walker's conduct deprive BreakZone of a fair hearing?*

BreakZone contends that it was fundamentally unfair to a proper hearing on its application for a CUP that Walker, a council member, filed the appeal of the planning commission's favorable determination; had received $5,500 in campaign contributions from BreakZone's landlord who was the developer of the center in which BreakZone was located; and participated in the hearing of, and voted on, BreakZone's CUP application.

BreakZone raised this issue when it filed a written request for withdrawal five days prior to the originally scheduled date for the hearing of Walker's appeal of the planning commission's determination. In that document, BreakZone alleged that the notice of appeal did not contain notice of "Mr.

Walker's concerns . . . or how they may be addressed." BreakZone also alleged that Walker had a conflict of interest because he had received campaign contributions of $5,000 during 1996 from La Caze and La Caze had an interest in the overturning of the planning commission's approval of the CUP for BreakZone. BreakZone attached the campaign contribution reports for Walker and copies of the leases between BreakZone and its landlord, a La Caze partnership. BreakZone also argues that the facts that Walker was both appellant and decision maker are sufficient evidence of bias that he should not have been allowed to participate in the hearing or vote on the CUP. In support of its argument, BreakZone also asserts that Walker made the first substantive presentation at the hearing, took control of the hearing and set the tone for the discussion.

In summary, BreakZone's contention is that its fundamental right to a fair hearing was infringed. The legal basis asserted in support of this contention is that the city council proceeding was an adjudicatory hearing and such a proceeding requires that the decision makers be free from bias and prejudice.

The contention that a fair hearing requires a neutral and unbiased decision maker is a fundamental component of a fair adjudication (e.g., *Goldberg v. Kelly* (1970) 397 U.S. 254, 271 [90 S.Ct. 1011, 1022, 25 L.Ed.2d 287]) and dates at least to *Bonham's Case* (1610) 77 Eng.Rep. 646, 652. In that case, the court announced the principle that no person can be a judge in his own case, finding that principle to be a fundamental tenet of natural law.[23] On the facts of this case, we will conclude there have been no violations of these principles.

### a. *Bias based on personal interest.*

A decision maker who stands to gain or lose from a decision is clearly disqualified from acting as a decision maker. This form of bias was prohibited at common law and is prohibited by statute. (*Clark v. City of Hermosa*

---

[23]The right to a fair hearing and an impartial adjudicator having been established, the question remains: What is bias and how is the principle to be applied? The categories of bias include: (1) interest in the outcome (a person who stands to gain or lose from a decision has an interest in the outcome that may be a disqualification if the gain or loss is a direct or perhaps a tangible, but indirect, consequence of the decision made); (2) strong bias about a party arising from an unofficial source (a decision maker may have an attitude about a party, rather than about an issue, which arises from an unofficial source); (3) precommitment based on knowledge of the facts of the case learned in advance of the adjudicatory proceeding that leads the decision maker to find only those facts to be true.

It is also necessary to draw two distinctions: (1) a point of view about a question of law or policy is not a disqualification by itself, and (2) a predisposition about legislative facts that helps answer a question of law or policy is not by itself a disqualification.

We discuss the aspects of bias relevant to this case in the text, *post.*

*Beach, supra,* 48 Cal.App.4th 1152; Gov. Code, § 81000 et seq.) In the context of the instant case, the allegation is that the making of campaign contributions in 1996 and earlier created a bias on the part of the recipient, Walker, in 1998. The difficulty for BreakZone with this argument is that the Political Reform Act, as interpreted by our Supreme Court, expressly limits the application of this rule to the 12-month period following the $250 threshold, as discussed in part 3, *ante.* Its contention is refuted by the express terms of Government Code section 87103 and by our Supreme Court's holding in *Woodland Hills, supra,* 26 Cal.3d at page 947. As our Supreme Court there stated: "Public policy strongly encourages the giving and receiving of campaign contributions. Such contributions do not automatically create an appearance of unfairness. Adequate protection against corruption and bias is afforded through the Political Reform Act and criminal sanctions. [Citations]." (*Ibid.*)

b. *Prejudgment of adjudicative facts.*

BreakZone also contends that the fact that one council member filed the appeal and participated in and voted on that appeal is a violation of the common law of conflict of interest and requires issuance of a writ of mandate. In support of this contention, BreakZone relies on *Withrow v. Larkin* (1975) 421 U.S. 35 [95 S.Ct. 1456, 43 L.Ed.2d 712] (*Withrow*) and *Cohan, supra,* 30 Cal.App.4th 547.

In *Withrow,* the Wisconsin medical examiner conducted a preliminary investigation, hearing testimony concerning a Dr. Larkin. The medical examiner then sent the doctor a notice of a hearing at which it would be determined whether his license to practice medicine should be suspended. Larkin sought relief from the federal district court, contending the board's action deprived him of a fair hearing. The district court found that the board was disqualified to decide his case. The United States Supreme Court reversed, finding that the board was not disqualified from conducting the hearing or making the decision on his license. While "a biased decisionmaker [is] constitutionally unacceptable," the crucial issue for the court was as follows: "The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication . . . must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." (*Withrow, supra,* 421 U.S. at p. 47 [95 S.Ct. at 1464].)

After analyzing the combination of investigative, charging and adjudicatory functions carried out by the board, the court held: "The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing." (*Withrow, supra*, 421 U.S. at p. 55 [95 S.Ct. at p. 1468].)

*Withrow* stands for the proposition that advance knowledge of adjudicative facts that are in dispute, as well as participation in the charging function, does not disqualify the members of an adjudicatory body from adjudicating a dispute; nor does the combination of such functions disqualify them from (1) determining that further investigation is warranted, (2) issuing the order to appear, and (3) making the ultimate decision after hearing on the merits. The teaching of *Withrow* is that there must be more, a commitment to a result (albeit, perhaps, even a tentative commitment), before the process will be found violative of due process.[24]

*Withrow* focuses us on applicable legal inquiry: whether (or the probability that) a participant in the adjudicatory process has an actual bias toward a party.

To prevail on a claim of bias violating fair hearing requirements, Break-Zone must establish "an unacceptable probability of actual bias on the part of those who have actual decisionmaking power over their claims." (See *U.S. v. State of Or.* (9th Cir. 1994) 44 F.3d 758, 772.) A mere suggestion of bias is not sufficient to overcome the presumption of integrity and honesty. (*Brooks v. New Hampshire Supreme Court* (1st Cir. 1996) 80 F.3d 633, 640; *Stivers v. Pierce* (9th Cir. 1995) 71 F.3d 732, 74.)

The rule under California law is similar. In *Griggs v. Board of Trustees* (1964) 61 Cal.2d 93 [37 Cal.Rptr. 194, 389 P.2d 722], our Supreme Court held that combining investigative and adjudicative functions in an administrative proceeding does not, by itself, constitute a denial of due process. (*Id.* at p. 98.)

Further, in *Burrell v. City of Los Angeles* (1989) 209 Cal.App.3d 568 [257 Cal.Rptr. 427], Division Five of this court held that certain provisions of the charter of the City of Los Angeles did not violate federal or state due process requirements. "The [Supreme] Court has found that allowing a single decisionmaker to undertake both the investigative and the adjudicative functions

---

[24]We have determined, *ante*, that this question should be determined under Code of Civil Procedure section 1094.5 fair hearing standards and that the due process clause is not implicated. Nevertheless, we find analogy to cases analyzing due process issues helpful to our analysis of the fair hearing issue.

in an administrative proceeding does not, by itself, constitute a denial of due process. (*Griggs v. Board of Trustees*[, *supra,*] 61 Cal.2d [at p.] 98 . . . .)" (*Id.* at pp. 581-582.)

Rather, as in the federal courts, our Supreme Court requires a party seeking to show bias or prejudice on the part of an administrative decision maker to prove the same with concrete facts: " 'Bias and prejudice are never implied and must be established by clear averments.' [Citation.] Indeed, a party's unilateral perception of an appearance of bias cannot be a ground for disqualification unless we are ready to tolerate a system in which disgruntled or dilatory litigants can wreak havoc with the orderly administration of dispute-resolving tribunals." (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792 [171 Cal.Rptr. 590, 623 P.2d 151]; accord, *Gill v. Mercy Hospital* (1988) 199 Cal.App.3d 889, 910-911 [245 Cal.Rptr. 304]; *American Isuzu Motors, Inc. v. New Motor Vehicle Bd.* (1986) 186 Cal.App.3d 464, 472-473 [230 Cal.Rptr. 769].) The court added, "[O]ur courts have never required the disqualification of a judge unless the moving party has been able to demonstrate concretely the actual existence of bias. We cannot now exchange this established principle for one as vague, unmanageable and laden with potential mischief as an 'appearance of bias' standard, despite our deep concern for the objective and impartial discharge of all judicial duties in this state. [¶] The foregoing considerations, of course, are equally applicable to the disqualification of a judicial officer in the administrative system. Indeed, the appearance of bias standard may be particularly untenable in certain administrative settings." (*Andrews v. Agricultural Labor Relations Bd.*, *supra*, 28 Cal.3d at pp. 793-794, fn. omitted.) In a footnote, the court observed that there were some situations in which a decision maker should be disqualified because of the "probability" of bias, such as when the decision maker has a personal or financial interest in the outcome, or is either familially or professionally related to the litigant. (*Id.* at p. 793, fn. 5.)

"Thus, it appears that the highest court of this state construes the state Constitution's due process guaranty of a fair and impartial administrative decisionmaker in the same manner as the federal courts have interpreted parallel provisions in the federal Constitution. In other words, mere involvement in ongoing disciplinary proceedings does not, per se, violate due process principles. [Conversely, t]hose principles are violated . . . if the official or officials who take part in the proceedings are demonstrably biased or if, in the least, circumstances such as personal or financial interest strongly suggest a lack of impartiality. Our Supreme Court has emphatically rejected the notion that a subjective 'appearance of bias' is enough to taint

an entire legislatively created system of handling disciplinary matters." (*Burrell v. City of Los Angeles, supra,* 209 Cal.App.3d at p. 582.)

Our decision in *Binkley v. City of Long Beach* (1993) 16 Cal.App.4th 1795 [20 Cal.Rptr.2d 903] (*Binkley*) provides further support for this view. In *Binkley,* we reversed the trial court's issuance of a writ of mandate, finding that the procedure by which a police chief had been discharged and his appeal heard were not fundamentally unfair. The basis for that holding was that the chief of police held his position at the pleasure of the city manager who was free to discharge him without just cause so long as the chief was given the opportunity to convince the employing authority to reverse its decision. We reached our conclusion despite the fact that the city manager had both initiated the process and retained final decision-making authority in the matter. In so holding, we relied in part on the following reasoning of the court in *Gray v. City of Gustine* (1990) 224 Cal.App.3d 621 [273 Cal.Rptr. 730]: "Bias and prejudice are not implied and must be clearly established. A party's unilateral perception of bias cannot alone serve as a basis for disqualification. Prejudice must be shown against a particular party and it must be significant enough to impair the adjudicator's impartiality. The challenge to the fairness of the adjudicator must set forth concrete facts demonstrating bias or prejudice." (*Gray, supra,* at p. 632; *Binkley, supra,* at p. 1810.)

We find distinguishable on this point *Mennig v. City Council* (1978) 86 Cal.App.3d 341 [150 Cal.Rptr. 207], cited by BreakZone, in which the court found that the members of the Culver City City Council, which had the ultimate decision-making authority on the tenure of that city's chief of police, had become personally embroiled in animosity over the chief and with his termination. The record in that case made clear the evidence of that embroilment. The city council's determination to impose a penalty harsher than that determined by its civil service commission was voided on due process grounds. (*Id.* at p. 351.) There is no such evidence of embroilment in the instant case.

We also consider inapposite *Clark v. City of Hermosa Beach, supra,* 48 Cal.App.4th 1152. There, the protesting city council member resided within a block of the applicants' proposed project and would personally benefit from denial of the application. (*Id.* at pp. 1172-1173.) In addition, the council member's history of personal animosity to the applicants made him "not a disinterested, unbiased decisionmaker." (*Id.* at p. 1173.) By contrast, there is no allegation of prior personal animosity by Walker and no indication that he had a personal financial interest in the instant application. We

discussed, in part 3, *ante*, the relationship of Walker to La Caze. Neither that relationship, nor the other facts present in this record, even when viewed together, are sufficient to sustain this prong of BreakZone's attack on the decision below.

Further, in *Cohan, supra*, 30 Cal.App.4th 547, Division Six of this court specifically addressed the action of a city council in appealing to itself the decision of its planning commission. After invalidating that action, the court cautioned: "Our holding should not be read as invalidating all appeals taken by a city council or other governing body to itself from a decision of a subordinate agency. We *do* emphasize, however, that if such a procedure is contemplated, it should be authorized by the ordinances or rules which govern appeals to such entity, and some direction should be given in such ordinances or rules concerning specification of grounds and appropriate burdens of proof. No elected individual appealed here. The *Council* appealed. Had a single council member been the appellant (and complied with the municipal code), he or she might have been disqualified but the remainder of the City Council could have voted." (*Id.* at p. 559.)

It is clear that the *Cohan* court did not resolve whether and under what circumstances an elected official might both appeal to a city council the decision of one of its committees, and later vote on an action of such committee. In considering this question, we note first that, in contrast to the circumstances present in *Cohan*, the Torrance Municipal Code specifically permits the filing of an appeal from the decision of the planning commission by a member of the city council. Thus, Torrance Municipal Code section 11.5.1 provides: "Except as otherwise provided in this Code, if any application for any permit or consent of any City body or official having such authority is denied or approved by any City body or official and no other body is designated in the Code to hear an appeal, the applicant, or any interested person adversely affected, upon payment of an appeal fee, the City Manager, or any member of the City Council, may file with the City Clerk, a written notice of appeal to the City Council from such decision within fifteen (15) days after such decision."

The Planning Commission of the City of Torrance is created and governed by chapter 3, article 1 of the Torrance Municipal Code. Section 13.1.7 provides in part: "a) The Commission shall hold hearings, make recommendations to the City Council and perform all duties required by law."

Chapter 5, article 1, section 95.1.2 states: "The responsibility for review and approval or denial of Conditional Use Permits is as follows: a) Conditional Use Permits will be reviewed and approved or denied by the Planning Commission."

It appears that under the Torrance Municipal Code there is no body formally designated to hear appeals from the decisions of the planning commission. Accordingly, section 11.5.1 would apply. We thus are confronted with the question left unanswered in *Cohan*: If an individual member of a city council follows a procedure set out in a properly drawn ordinance, is he or she disqualified from participating in the subsequent hearing and voting on the matter?

■ Differently stated: Is it fundamentally unfair for the government official appealing the action to participate in the hearing on the appeal and vote on that appeal?

*Cohan* suggests that it might be, but does not expand on that suggestion. Neither party cites cases that decide the question.

While BreakZone urges that Walker's participation in the hearing was demonstrative of bias, arguing that this is shown by his taking charge of and controlling the hearing, being the first council member to make comments at the close of the public session and setting the tone for that discussion, our review of the record does not support this interpretation of the tenor of the hearing or of the council's discussion prior to the unanimous vote to sustain the appeal and reverse the determination of its planning commission. Rather, the mayor exercised a firm hand over the proceedings and called on Walker to speak. That is logical as he did file the appeal. There is no indication in the record that Walker dominated the proceedings. Further, after all witnesses had spoken and before the public hearing was closed, the mayor asked counsel for BreakZone if there were any more facts or comments which BreakZone wished to present. In declining that request counsel for BreakZone engaged in the following colloquy with the mayor:

"[Mayor Hardison]: Do you or obviously Ms. Booth and the proponents of Breakzone, do you feel like you've had an adequate opportunity to respond to the scope of tonight's hearing and are there any other issues that have been raised, questions of council's staff that we haven't dealt with adequately tonight?

"[Counsel for BreakZone]: You've asked quite a question. This has been a very extensive hearing. I think the way it has been offered to us has been one that is in your discretion in terms of the procedure that you follow, the acceptance of additional information. [¶] It would not be one that I would have followed under your statute if this was an appeal, but I certainly think that all of you have listened attentively and heard all the comments that could be presented tonight. We've had a lot of people who couldn't be here after the third hearing, but that's part of the process.

"[Mayor Hardison]: So then I want to make sure then, I think we're about to close the public hearing and I want to make sure that there wasn't anything we needed to do to continue this on any issue that you felt we hadn't adequately addressed.

"[Counsel for BreakZone]: I think it's appropriate to make a decision tonight so that we can move on and realize where we are. It's been a very long, agonizing process for my clients, as you can imagine. It's been a very important, time consuming, very expensive process. So we would like to have a decision."

Thus, the record does not contain the factual predicate necessary to sustain BreakZone's allegation that the proceeding was unfair.

The principle of *Withrow* that is of particular relevance to the instant proceedings is its distinguishing the process required in an adjudicatory administrative proceeding from that required in a judicial proceeding. In the former, the members of an administrative agency may investigate the facts, institute proceedings and make the necessary adjudications. "This mode of procedure does not violate . . . due process of law." (*Withrow, supra,* 421 U.S. at pp. 53, 56-57 [95 S.Ct. at pp. 1467-1468, 1469-1470].) "The risk of bias or prejudgment in this sequence of functions has not been considered to be intolerably high or to raise a sufficiently great possibility that the adjudicators would be so psychologically wedded to their complaints that they would consciously or unconsciously avoid the appearance of having erred or changed position." (*Id.* at p. 57 [95 S.Ct. at p. 1469].) Viewed in the light of *Withrow,* BreakZone has not presented facts sufficient to sustain its burden.[25] (*Id.* at pp. 57-58 [95 S.Ct. at p. 1469-1470].)

5. *Actions of the city attorney.*

BreakZone contends that the city attorney "became an advocate on behalf of the appeal, and against the Application," "taking a leading role in arguing against the Application." From this position, BreakZone argues that the conduct of the city attorney added to the appearance of bias and unfairness.

Review of the record shows that the city attorney was not advocating a particular position. For example, during the discussion of the number and significance of police contacts in the vicinity of BreakZone, he stated: "I

---

[25]BreakZone asserts other indicia of unfairness at the hearing, particularly concern over reaction of one member of the city council to submission of partial transcripts of other proceedings. We do not find this contention meritorious.

think we discount the majority of [the Vehicle Code violations], if not all of them, as a traffic stop unless there is something that would tie it to the particular location . . . ." This is but one indication that he was merely acting as attorney for the city council and that he understood BreakZone's position that the police department practice of tying every incident to an address which happened to be a nearby business did not mean that every stop was caused by illegal activity at that business. We find no support in the record for BreakZone's contention that the city attorney was biased and that that bias infected the proceeding so that it rendered it fundamentally unfair.

6. *Were "new" matters improperly raised at the hearing before the city council?*

BreakZone contends that new and different matters were raised at the February 10 hearing and that the failure to disclose these matters to Break-Zone earlier in response to its request made it impossible for BreakZone to prepare and respond to them. BreakZone relies principally on the disclosure at the February 10, 1998 city council hearing of police contacts in the vicinity of BreakZone which had not been previously disclosed in response to its 1997 request for public records.

 This contention is answered by the very scope of the hearing before the city council: de novo review. As discussed, *ante*, it has been long established that such a hearing before a city council is a de novo proceeding even though it is styled as an appeal. (*Russian Hill Improvement Assn. v. Board of Permit Appeals, supra*, 66 Cal.2d 34, 46; *McDonald's Systems of California, Inc. v. Board of Permit Appeals, supra*, 44 Cal.App.3d 525, 539; *Lagrutta v. City Council, supra*, 9 Cal.App.3d 890, 895; *Anderson v. Pittenger, supra*, 197 Cal.App.2d at p. 195.)

As a de novo proceeding, it is apparent that the hearing on February 10 had a broad scope; that hearing was the forum for presentation of all evidence relating to the application for this CUP. There may have been facts presented that evening of which BreakZone was not previously aware, but that circumstance can be expected to occur at any public hearing. The hearing was open for introduction of all evidence, whether presented before or not. Members of the public have a right to voice their views at such hearings and neither applicant nor council member can be certain of the specific facts that will be presented.

In the instant case, there was little that was new. The additional evidence of police activity, which is the focus of BreakZone's contentions, was literally "more of the same." While the fact that the specific incidents had

not been disclosed in response to BreakZone's 1997 request was not explained, BreakZone did respond and was offered additional time and a continuance, which it declined. BreakZone did not ask for a postponement or a recess in the hearing; rather, when, near the end of the hearing, the mayor offered a continuance so that Breakzone could address issues raised at the hearing, BreakZone's counsel declined and asked that a decision be made that evening. (See pt. 4, *ante.*)

BreakZone has not cited a case that holds that a city's failure to earlier disclose information in response to a public records request precludes introduction of the material at a public hearing. We suggest that the two are independent. On the facts of this case, this contention lacks merit.

7. *Was there a cumulative appearance of bias which was evident at the city council hearing?*

BreakZone contends that "[t]he cumulative effect of the City's actions resulted in a violation of Petitioner's procedural and substantive due process rights." In support of this contention, BreakZone lists the several factors discussed above. As the individual factors were not acts in contravention of BreakZone's due process rights, their sum cannot be, either.

Unlike *Cohan, supra,* 30 Cal.App.4th 547, there were no individual procedural errors, the cumulative effect of which was a violation of the applicant's rights. Further, near the end of the public hearing, the mayor asked Chartier whether BreakZone would accept a CUP which did not permit the sale of alcohol. This was clearly an attempt to determine if the granting of the CUP without allowing service of alcoholic beverages would be acceptable to BreakZone. BreakZone's response was that "We need the alcohol and the full restaurant, not only to survive, but to grow . . . ." In addition, before closing the public hearing, the mayor asked counsel for BreakZone if they wished "to respond to anything that's been said . . . ." In response, one counsel for BreakZone stated: ". . . I want to thank you for giving us such a complete hearing and the time that all of you have taken to consider this." After additional comments by counsel for BreakZone, the mayor engaged in the colloquy with counsel for BreakZone set out, in part 4, *ante.*

Additional citations to the record, or to cases, are unnecessary. The record reflects no discernable evidence of bias on the part of the city council.

8. *Was there substantial evidence to support the decision of the city council?*

 a. *Legal predicate.*

■ Findings must be made by the quasi-judicial body as part of its determination of whether to grant or deny a CUP. (*Stoddard v. Edelman* (1970) 4 Cal.App.3d 544, 548-549 [84 Cal.Rptr. 443].) Such findings must be supported by substantial evidence in light of the entire record. Appellate courts review ·such adjudicatory planning actions under the substantial evidence standard, looking to the administrative record to determine whether the agency's decision is supported by substantial evidence and whether the findings of the agency support the decision made. (*Paoli v. California Coastal Com.* (1986) 178 Cal.App.3d 544, 550-551 [223 Cal.Rptr. 792].) Reasonable doubts must be resolved in favor of the decision of the agency. (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12] [variance case]; *Saad v. City of Berkeley* (1994) 24 Cal.App.4th 1206, 1212 [30 Cal.Rptr.2d 95]; *Pescosolido v. Smith* (1983) 142 Cal.App.3d 964, 970 [191 Cal.Rptr. 415].)[26] The substantial evidence test applies when the permit action results in restricting an owner's (and arguably a lessee's) return on the property, a reduction in profits, or an increase in the cost of doing business. (*E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325-326 [65 Cal.Rptr.2d 325].)

Our review of this administrative decision requires that we "scrutinize the record and determine whether substantial evidence supports the [city's] findings and whether these findings support [the city's] decisions. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at p. 514.) "[We] may reverse an agency's decision only if, *based on the evidence before the agency,* a reasonable person could not reach the conclusion reached by the agency. [Citation.]" (*Lindborg-Dahl Investors, Inc. v. City of Garden Grove* (1986) 179 Cal.App.3d 956, 961, fn. 7 [225 Cal.Rptr. 154].) Further, we must deny the writ if there is any substantial evidence in the record to support the findings. (*Smith v. County of Los Angeles, supra,* 211 Cal.App.3d 188, 198-199 [259 Cal.Rptr. 231].)

---

[26]Only when a fundamental vested right is affected does the reviewing court apply the independent judgment test. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805 [85 Cal.Rptr.2d 696, 977 P.2d 693]; *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29]; *Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1525 [8 Cal.Rptr.2d 385].)

The CUP in a specific case rests upon the sound discretion of the regulatory body, here the city council. (See *Smith v. County of Los Angeles, supra*, 211 Cal.App.3d at p. 197 [CUP application for adult nude cabaret properly denied where applicant did not demonstrate compliance with extant criteria]; *Guinnane v. San Francisco City Planning Com., supra*, 209 Cal.App.3d 732, 736 [257 Cal.Rptr. 742].)

When an applicant appeals a decision made by a planning authority, it bears the burden of establishing that each of the findings made by the agency is not supported by substantial evidence. (*Desmond v. County of Contra Costa* (1993) 21 Cal.App.4th 330, 336-337 [25 Cal.Rptr.2d 842] [test is whether there is "no substantial evidence whatsoever" to support any of the findings made].)

An agency determination that another business dispensing alcoholic beverages, or that the granting of an application for a CUP, would fundamentally change the character of a commercial establishment or commercial area, "articulates various significant elements necessarily included in the general concept of public welfare . . . ." (*Desmond v. County of Contra Costa, supra*, 21 Cal.App.4th at p. 338; *Harris v. City of Costa Mesa* (1994) 25 Cal.App.4th 963, 975 [31 Cal.Rptr.2d 1].) ██ Issues relating to the zoning and permitting of establishments that sell alcoholic beverages have long been considered particularly susceptible to regulation by state and local authorities. (E.g., *Korean American Legal Advocacy Foundation v. City of Los Angeles* (1994) 23 Cal.App.4th 376, 388 [28 Cal.Rptr.2d 530] [purpose of city's ordinance is to abate nuisance activities]; see *Town of Los Gatos v. State Bd. of Equal.* (1956) 141 Cal.App.2d 344 [296 P.2d 909] [town brought mandamus action to forbid transfer of on-sale license after location was rezoned for single family residences].) Decisions regarding the sale of alcoholic beverages are subject to state as well as local control. Local agencies may regulate zoning and land use activities in general (*Korean American Legal Advocacy Foundation v. City of Los Angeles, supra*, at pp. 392-393) and in particular the location of establishments that sell alcohol. (*Floresta, Inc. v. City Council* (1961) 190 Cal.App.2d 599, 605 [12 Cal.Rptr. 182]; *Jon-Mar Co. v. City of Anaheim* (1962) 201 Cal.App.2d 832, 837-839 [20 Cal.Rptr. 350].) "[T]he social impact of a . . . bar obviously differs fundamentally from that of a store [that] sells liquor for consumption off the premises." (*Floresta, Inc. v. City Council, supra*, at p. 606.) "The customers attracted to [a neighborhood shopping center], including those who may use the services of restaurants or coffee shops located therein, ordinarily are not attracted thereto by the business of a beer parlor. Whether, by appropriate zoning regulation, a beer parlor type of business should be excluded from an

area designed to cater to prospective customers of ordinary neighborhood retail sales stores, at least, is a matter about which reasonable persons may differ and, under such circumstances, a decision in favor of exclusion may not be deemed unreasonable or arbitrary. Where the reasonableness of a zoning classification 'is fairly debatable, the legislative determination will not be disturbed' by the courts. [Citations.]" (*Jon-Mar Co. v. City of Anaheim, supra,* 201 Cal.App.2d at p. 839; see also *Amusing Sandwich, Inc. v. City of Palm Springs* (1985) 165 Cal.App.3d 1116 [211 Cal.Rptr. 911].) While the context of the discussion in *Jon-Mar* was legislative rather than adjudicative, the same rule applies to the instant situation. The determination of a city council or zoning agency is entitled to be sustained if there is any substantial evidence to support it.

■ In reaching a decision on an application for a CUP it is also appropriate for an agency to consider traffic, parking, safety, noise and nuisance problems; these clearly represent concerns that are well within the domain of the public interest and public welfare. (*Desmond v. County of Contra Costa, supra,* 21 Cal.App.4th at p. 337.) Such findings are sufficient basis to sustain a permit or zoning decision when they are supported by substantial evidence. (*Guinnane v. San Francisco City Planning Com., supra,* 209 Cal.App.3d at p. 743; *Paoli v. California Coastal Com., supra,* 178 Cal.App.3d at pp. 550-551.)

b. *The city council's findings.*

At its meeting in the month following the February 10 hearing, the city counsel adopted Resolution No. 98-29 denying the CUP application of BreakZone. That resolution contained two principal findings and three reasons in support of the first finding.

First, the city council found the location, design and operating characteristics of BreakZone's property as proposed in the applications for CUP were not compatible with the public interest because of (1) the late operating hours, use of amplified sound on the patio, and sale of alcoholic beverages; (2) the number of significant police department contacts; and (3) the alteration of the nature of the business from "100% family" to a "majority adult use." Second, the council determined that the proposed use was incompatible

with an existing neighborhood land use "because BreakZone patrons congregate outside the BreakZone and harass patrons of the neighboring land use."[27]

The findings of the adjudicatory agency are presumed to have been supported by substantial evidence. As discussed, *ante*, the petitioner in an administrative mandamus proceeding bears the burden of establishing that the agency's decision was invalid and should be set aside. (E.g., *Desmond v. County of Contra Costa, supra,* 21 Cal.App.4th 330.)

We are not directed to any ordinance of the City of Torrance which requires that any specific findings be made when the adjudicatory body denies an application for a CUP. (Cf. *Harris v. City of Costa Mesa, supra,* 25 Cal.App.4th 963 [31 Cal.Rptr.2d 1], in which that city's CUP ordinance required that certain findings be made before a CUP may be granted [*id.* at p. 972].)

After a careful reading of the record, we conclude that there was substantial evidence to support the decision of the city council. BreakZone makes several cogent points with respect to individual findings of fact contained in the resolution denying its application for a CUP. For example, it is clear that the persons sitting on the steps of the private school drinking alcoholic beverages did not purchase them at BreakZone and were not at that point BreakZone customers, if ever they were; and that it may not be appropriate to conclude in every case (or in most cases) from the fact that police department records which list BreakZone as the location for incidents are

---

[27]Resolution No. 98-29 provided: "1. The proposed location, design and operating characteristics of the requested use would not be compatible with the public interest, health, safety, convenience, or welfare, or to the property of persons located in the area for the following reasons: (a) Late operating hours, use of amplified sound on the proposed open air patio and sale of alcoholic beverages would create undesirable levels of late-night activity and noise particularly adversely affecting neighboring residences. (b) The number of significant Police Department contacts associated with the existing business. (c) The fundamental nature of the existing business would be altered from a 100% family use to a majority adult use, by reason of the proposed sale of alcoholic beverages, the location of the proposed food service station within the adult portion of the premises, where minors would not otherwise be permitted, and upon the outside patio, where minors would be likely to be placed in proximity with smokers.

"2. The proposed use is incompatible with an existing neighboring land use (tutoring school) because Breakzone patrons congregate outside the Breakzone and harass patrons of the neighboring land use. [¶] Now, THEREFORE, THIS CITY COUNCIL DOES HEREBY FIND AND RESOLVE that CUP97-0005 filed by Breakzone Billiards to allow full alcoholic beverage and full food service, additional recreational facilities including pool, foosball, air hockey, arcade games, pool clinic and lessons, pro shop and smoke shop, as shown on Planning Commission Identification No. 97-82 on file in the Planning Department of the City of Torrance, is hereby DENIED."

indicators, that the crime or police contact was generated by activity at BreakZone. These examples suggest that not all of the findings are supported by substantial evidence.

It is also clear that BreakZone sought to fundamentally change the nature of its business, from a 16-table youth-oriented billiard and game/recreation center to a much larger, adult-centered facility which allowed the consumption of alcoholic beverages on the premises. The city council specifically found that such a use would not be compatible with the public interest. That finding is supported by substantial evidence, including the determination of its planning commission staff which had originally recommended denial of the application, in part, because "[I]n the judgment of staff, allowing the service of alcohol from the subject business, based on the past history [sic] of incidents, would be incompatible with the surrounding business."[28]

Changes in operation by businesses of this nature are subject to review by local zoning authorities who exercise their police power for the welfare of the community. While it is a correct statement that the record reveals that there were already 18 other establishments in the same vicinity which sold alcoholic beverages, whether in restaurants, or in a nearby liquor store, or by other means, it does not follow that the council must approve every application for a business that dispenses alcoholic beverages. Decisions such as this—literally, where to draw the line—are best left to the local zoning agencies; they are in the best position to exercise sound judgment as to appropriate uses for sites within the zoning classifications which they establish. That is one reason why we review such decisions under the standard discussed above. In this case, the city council had substantial evidence from which it could conclude that it was time to draw the line.[29] (See *Smith v. County of Los Angeles, supra,* 211 Cal.App.3d at p. 205 [substantial evidence supported decision of planning commission that particular use was inconsistent with desired environment of site].)

There was substantial evidence to support at least some portions of the resolution of the Torrance City Council and, thus, the action which is before this court for review. The contrary contention is without merit.

---

[28]Resolution No. 98-29 lists several examples of how the nature of BreakZone's business would be changed if the application for CUP were granted. In addition to finding "[t]he fundamental nature of the existing business would be altered from a 100% family use to a majority adult use . . . by reason of the proposed sale of alcoholic beverages," there was also substantial evidence that the late hours would adversely affect neighboring residences.

[29]BreakZone specifically told the council it did not want the application granted unless it included the sale of alcoholic beverages. Co-owner Chartier testified, "We need the alcohol and the full restaurant, not only to survive, but to grow and be a better . . . place for the city." This view was reemphasized by co-owner Boyd in remarks just a few moments later. BreakZone's owners thus rejected issuance of the CUP with conditions.

## DISPOSITION

The judgment is affirmed. Each party is to bear its own costs.

Boren, P. J., and Nott, J., concurred.