Filed 6/22/26  Hassien v. The Regents of the U. of Cal. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MICHEL HASSIEN, | |
| Plaintiff and Appellant, | G064512 |
| v. | (Super. Ct. No. 30-2023-01314184) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Thomas S. McConville, Judge. Affirmed.

Hathaway Parker, Mark M. Hathaway and Jenna E. Parker for Plaintiff and Appellant.

Venable, Jean-Paul P. Cart and Mona Mujaddidi for Defendant and Respondent.

\*                    \*                    \*

Plaintiff Michel Hassien was employed as a maintenance supervisor at the University of California, Irvine (UCI), which is governed by defendant Regents of the University of California (the Regents).[1] UCI investigated Hassien after an employee he supervised (complainant) accused him of stalking, sexual harassment, and bullying. During the investigation, several people familiar with Hassien and complainant were interviewed, and many of them corroborated complainant's allegations. UCI terminated Hassien's employment based on the results of the investigation, which were documented in a formal 50-page report (the report).

Hassien requested formal review of his termination. The final step of this process involved a two-day hearing (the review hearing), in which UCI and Hassien could call witnesses who were subject to cross-examination. Neither UCI nor Hassien called complainant or any of the people interviewed during its investigation to testify. UCI submitted the report as evidence and called the report's drafter and Hassien's supervisor who had made the decision to terminate him. After reviewing the evidence presented, the hearing officer found there was adequate evidence to support Hassien's termination.

Hassien then filed this petition for writ of mandate in the trial court (the petition), seeking an order directing the Regents to set aside the hearing officer's findings. The court denied the petition and entered judgment

---

[1] Hassien initially filed this lawsuit anonymously as "John Doe." The Regents filed a motion to strike all references to "John Doe" and replace them with his true name, which the trial court granted. However, the lower court continued to refer to this case as *Doe v. Regents of the University of California*. We have replaced the "John Doe" designation in the caption with Hassien's true name since there are no longer any privacy concerns. (Cf. Cal. Rules of Court, rule 8.90(b).)

against Hassien and in favor of the Regents. On appeal, Hassien argues the court's judgment should be reversed and the hearing officer's findings set aside. We find no error.

First, Hassien claims UCI denied him a full evidentiary hearing with due process protections. Among other things, he argues that it failed to call complainant or any of the individuals interviewed during the investigation as witnesses at the review hearing, which denied him the opportunity to cross-examine them. We find the relevant procedures satisfied due process. At the review hearing, Hassien had no right to cross-examine the complainant or any of the individuals UCI interviewed during its investigation. Further, to the extent he sought to question these individuals, it is undisputed that Hassien made no attempt to call them as witnesses himself.

Second, Hassien contends UCI's termination decision was unsupported by substantial evidence because it was based entirely on uncorroborated hearsay (i.e., the report). But Hassien has not shown that the hearing officer could not rely entirely on hearsay in making her decision. And, even if Hassien's contention were true, the hearing officer's decision was not based solely on uncorroborated hearsay. Hassien's supervisor provided admissible, nonhearsay testimony that was corroborated by the alleged hearsay evidence.

Third, Hassien asserts that several parties, including the hearing officer, were biased against him. He has not shown that any of the relevant parties were biased.

The judgment is affirmed.

3

FACTS AND PROCEDURAL HISTORY

I.

ALLEGATIONS MADE AGAINST HASSIEN

The Regents is the governing body of the University of California public school system (the University of California), which includes UCI. UCI employed Hassien as the Senior Building Maintenance Supervisor in the Palo Verde student housing community from December 2006 to October 2020. In August 2019, complainant, who was a custodian supervised by Hassien, began contacting Jennifer Martinez, Hassien's supervisor. During these contacts, complainant indicated that she wanted to report something to Martinez but wanted Martinez to promise "not [to] say anything to anybody about it or act on it." Complainant would leave when Martinez explained that she would have to report any allegations of sexual harassment or violence. According to Martinez, she and complainant "did this dance for a while," but complainant began to share small pieces of information over time.

After a few of these interactions, complainant informed Martinez that Hassien had engaged in harassment and bullying over a seven-year period. Martinez took notes and organized complainant's allegations into three categories: stalking, harassment and retaliation, and fear mongering. Martinez forwarded her notes to UCI's Office of Equal Opportunity and Diversity (the EOD Office).

In September 2019, the EOD Office informed Martinez that it would investigate complainant's allegations along with UCI's human resources office (HR). The EOD Office prepared a memorandum summarizing complainant's allegations and noted that Hassien had potentially violated several policies of both the University of California and UCI, including

4

policies on sexual harassment, discrimination and harassment, abusive conduct, and workplace violence.[2]

## II.

### THE INVESTIGATION

The assigned investigators were Holly Hare, from the EOD Office, and Susan Ha, from HR. Hare and Ha interviewed complainant three times, Hassien twice, and interviewed 10 other witnesses. They also examined documentary evidence Hassien submitted, including (1) a text log from January 2019 to July 2019, (2) Hassien's phone log from April 2019 to September 2019, and (3) certain text message conversations between Hassien and complainant that occurred from November 2018 to August 2019 (Hassien provided select text message conversations, not all of the text messages sent between these dates). The investigators also reviewed responses from both Hassien and complainant to a draft of the report.

---

[2] The specific policies were (1) University of California Policy on Sexual Violence and Sexual Harassment (Section 11.B .1.d. Stalking), (2) UCI Guidelines for Reporting and Responding to Reports of Sex Offenses (Section C.1.d. Stalking), (3) University of California Sexual Violence and Sexual Harassment Policy (Sections 11.B.2.a.ii. Sexual Harassment-Hostile Environment), (4) UCI Guidelines for Reporting and Responding to Reports of Discrimination and Harassment (Sections C.1.3. Sexual Harassment-Hostile Environment), (5) University of California Policy on Discrimination, Harassment, and Affirmative Action in the Workplace, (6) UCI Guidelines for Reporting and Responding to Reports of Discrimination and Harassment, (7) University of California Guidance on Abusive Conduct and Bullying in the Workplace, (8) University of California Statement of Ethical Values & Standards of Ethical Conduct, (9) University of California Workplace Violence Prevention Policy, and (10) Personnel Policies for Staff Members 62, 63, and 64.

## A. *Witness Interviews*

The report contains nearly 20 pages summarizing the accounts of complainant, Hassien, and the 10 interviewed witnesses. The descriptions below are not meant to be exhaustive and only cover some of the salient points that were mentioned during interviews.

### 1. *Complainant's account*

Complainant stated that Hassien was "'obsessed' with her." He monitored her throughout the workday, constantly asking for her location over the radio. Complainant was in a romantic relationship with another UCI employee, who was identified as witness 10. Hassien would follow complainant to and from her car to watch her pick up and drop off witness 10 during lunch breaks. Hassien would also get upset at complainant for speaking with other staff members, particularly males. He purportedly told her not to talk to any other employees except another female and one male that Hassien believed "'was gay.'" Hassien also repeatedly called complainant over the phone and sent her text messages.

Complainant also mentioned that Hassien liked to hug employees and kiss them on the cheek. He got mad at complainant when she asked him not to hug her. Hassien told complainant that she was "'pretty'" and "'deserved a better man.'" He also made comments about complainant's sex life. For example, he asked whether she "'ha[d] sex'" during her lunch break. On one occasion, he asked if she had "'sucked some d*ck'" after she returned from lunch. Another time, he asked if "she 'wanted to f*ck around' while touching her leg with his leg." These types of interactions occurred multiple times.

Complainant also asserted that Hassien made comments about her breasts and caught him staring at her breasts many times. He once

touched one of her breasts in 2017 while they were in an empty apartment unit on campus. He then laughed and "said that he was 'playing.'" He also commented about the breasts and legs of female students on campus.

Hassien also engaged in other forms of verbal harassment, allegedly calling complainant derogatory names like "'b*tch,' 'motherf*cker,' and 'stupid.'"

Employees were afraid to report Hassien because he threatened them with repercussions. Hassien purportedly once threatened to kill his supervisor if he was fired. Complainant recalled him saying, "'[i]f they fire me, I'll come and kill [the supervisor] and leave.'"

During interviews, complainant acknowledged that she was angry at Hassien around 2019 because she believed he had reported her relationship with witness 10 to the EOD Office.

2. *Hassien's account*

Hassien denied having romantic feelings for complainant and denied her sexual harassment allegations, calling them "'ridiculous.'" He likewise denied making any sexual jokes and denied ever commenting on complainant's appearance. But he conceded that "he 'might have called her pretty when [he] was consoling [her].'" He denied making remarks about other women's appearances, saying "it was a gross accusation."

Hassien admitted that he told all his employees he loved them "because he 'genuinely loves people.'" He was "a 'hugger'" and sometimes greeted his staff with hugs and "a 'peck on the cheek.'" He claimed "that Complainant would reach over to him to initiate hugs and kisses with him." However, because English was complainant's second language, he thought she "may have misunderstood his 'kindness and respect for something else,'" so he stopped greeting her with a kiss on the cheek.

According to Hassien, he only monitored complainant to ensure she followed her work schedule because he had been told she was taking extra breaks to spend time with witness 10. He denied complainant's allegations that he had told her not to interact with other staff members except for "one female employee and one 'gay' male employee."

Hassien acknowledged cursing at work because that was the workplace's culture, but he denied ever calling complainant any of the terms she had identified.

Hassien said most of the phone and text communications between him and complainant were initiated by her and related to work. He provided the documentary evidence listed above to support his claim.

Finally, Hassien claimed complainant was retaliating against him because she thought he had reported her relationship with witness 10 to the EOD Office, which he denied. He explained that she had "sent him a text message threatening to 'come after [him].'" He also believed certain witnesses were biased against him. Specifically, he alleged that witness 2 had romantic feelings for complainant and witness 5 disliked him due to friction at work.

3. *Other witness accounts*

Many of the interviewed witnesses believed that Hassian had romantic feelings for complainant and noted that he constantly tracked her at work. Witness 10 stated that he had lunch with complainant every day, and Hassien would constantly show up or drive by to watch them. Witness 2 believed Hassien had romantic feelings for complainant and recalled Hassien frequently calling complainant on her work radio to ask her location and "was 'aggressive and heavy handed.'" Witness 2 stated Hassien "would 'badger and

8

harass'" complainant by telling her things like, "'let's go into these [housing] units and mess around.'"

Likewise, witness 3 believed that Hassien had romantic feelings for complainant and was "'obsessed' with her." Hassien frequently asked about complainant's location or why she was gone. Witness 3 remembered hearing Hassien "'scream' for Complainant over the radio when he could not find her." Witness 3 said this happened four to five times a day, and "only for Complainant, not other coworkers." Witness 5 stated that Hassien called complainant on the radio more than other employees, and Hassien's "behavior seemed 'more attentive than it needed to be.'"

Witness 8 recalled that Hassien frequently asked for complainant's location on the radio "with anger in his voice." Hassien also followed complainant around so much, witness 8 once asked Hassien if he was "'stalking [her].'" Witness 9 stated that on certain days Hassien made many radio calls asking for complainant and sounded frustrated.

Several witnesses also noted that Hassien appeared to get jealous if complainant spoke to other men. Witness 3 claimed that Hassien would follow complainant around work and would get mad if she spoke to male coworkers. According to witness 3, "Complainant was only allowed to talk to Witness 3 and one other coworker." Witness 3 once saw complainant talking to a contractor and overheard Hassien say something like, "'[h]e's cute,' and 'I want to kill him,'" which scared witness 3.

Witnesses also stated that Hassien made sexual comments about complainant. Witnesses 2 and 8 both recalled Hassien making comments about complainant's breasts, and witness 2 remembered Hassien joking about "'play[ing] with [complainant's] tits'" a few years prior. Witness 2 told investigators that Hassien asked complainant several times "whether she

9

was having sex during her lunch break." Witness 2 also remembered Hassien asking complainant if she had been "'f*cking around'" during lunch. Similarly, Witness 8 stated that Hassien would frequently "ask Complainant if she had had sex during the [lunch] break." Witness 8 also recalled a specific incident in July 2019, when Hassien "asked Complainant if her hair was messy because she was 'sucking [Witness 10's] d*ck' over the lunch break."

Other witnesses had heard Hassian make sexual comments not involving complainant. For example, witness 5 had heard Hassien making sexual jokes in the past and had "spent many hours" talking with Hassien about "'boundaries.'" Witness 8 stated that everyone joked at work but Hassien sometimes "'crossed the line.'" Specifically, witness 8 recalled that Hassien made "jokes about penises and sex" and talked about breasts and vaginas. When witness 8 confronted Hassien about his sexually charged comments, Hassien asked, "Witness 8 whether Witness 8 was gay." Witness 9 stated that Hassien made sexual jokes but only to men.

Many witnesses also noted that Hassien had a temper and referred to coworkers using derogatory terms. Witness 1 once observed Hassien engage in a shouting match with another employee. Likewise, witness 7 averred that Hassien had a quick temper and that concerns about his swearing had been raised in the past. Witness 9 reported that Hassien sometimes raised his voice with others. Witness 3 stated that Hassien had a temper and that his yelling scared witness 3. Witness 3 also recalled hearing Hassien threaten to shoot another coworker on one occasion. Witness 5 likewise described Hassien "as being angry and hostile more often than he need[ed] to be."

According to witness 8, Hassien frequently used profanity and called his colleagues derogatory names. For example, he called another

10

employee "a 'fat b\*tch'" several times the year prior to the investigation. Witnesses 2, 8, and 10 all stated that Hassien called complainant a "'b\*tch'" and "'c\*nt'" numerous times.

## B. *The Report's Preparation*

After completing the above interviews, Hare left UCI for another position. She was replaced by Cris Buckley from the EOD Office, who drafted a 50-page report dated June 26, 2020 (defined above as the report). Buckley prepared the report after consulting the investigators, reviewing their notes, and looking "at the consistency of the information, the plausibility of it, corroboration, actual knowledge, omissions, demeanor, and then bias or motive to falsify or exaggerate."

The report concluded by a preponderance of the evidence that Hassien had violated numerous policies of the University of California and UCI by (1) engaging in unwelcome physical or verbal conduct of a sexual nature that constituted sexual harassment, (2) engaging in repeated conduct of a sexual or romantic nature towards complainant that constituted stalking, (3) directing abusive conduct towards complainant and other staff members, (4) exhibiting conduct inconsistent with UCI's commitment to respect and dignity, and (5) making threatening comments about shooting or harming others.

11

## C. Hassien's Termination

After reviewing the report, Martinez concluded that Hassien's termination was warranted under Personnel Policy 64 (Policy 64).[3] She sent Hassian a Written Notice of Intent to Terminate dated July 31, 2020 (the termination notice). The termination notice explained that the EOD Office and HR had conducted a joint investigation of allegations concerning sexual harassment, stalking, workplace bullying, and threats. It then summarized the investigation and the report's findings.

The termination notice informed Hassien that based on the report's findings, UCI intended to terminate his employment effective August 11, 2020. It closed by informing Hassien of his right to respond to the termination notice orally or in writing. A copy of the report was included with the termination notice, as well as copies of the policies that Hassien had violated.

---

[3] Under the relevant portion of Policy 64, "[r]egular status professional and support staff may be terminated from employment because of misconduct or failure to maintain appropriate work performance standards. Normally, termination is preceded by corrective action . . . unless immediate dismissal is warranted."

## III.

### THE ADMINISTRATIVE PROCEEDINGS

#### A.  *The* Skelly *Hearing*[4]

As directed by the termination notice, Hassien submitted a response to Lisa Anderson, Director of Finance and Business Operations, Student Housing. He denied complainant's allegations and argued the report's findings were unsupported by evidence. He requested a *Skelly* hearing prior to his termination.

A *Skelly* hearing was held with Hassien and his counsel in August 2020. At this hearing, Hassien claimed that complainant had lied and was retaliating against him because she believed he had reported her relationship with witness 10 to the EOD Office. He also argued that he had not received a fair investigation and there was a lack of corroborating evidence. Anderson found that there were reasonable grounds to terminate Hassien. She sent this recommendation to Martinez, who formally terminated Hassien's employment.

#### B.  *Request for Review*

Hassien requested formal review of his termination under University of California policy. The first step was a review of the documents supporting Hassien's termination by the Executive Director of Student

---

[4] "*Skelly [v. State Personnel Board* (1975) 15 Cal.3d 194] requires that civil service employees be given notice of proposed disciplinary action, the reasons for the action, a copy of the charges and the written materials upon which they are based, and an opportunity to respond either orally or in writing. [Citation.] A '*Skelly* hearing' refers to the employee's opportunity to respond, and it has been described as an 'informal probable-cause-type proceeding.'" (*Chaplin v. State Personnel Bd.* (2020) 54 Cal.App.5th 1104, 1109, fn. 2.)

Housing. The Executive Director concluded the report's findings were supported by the evidence and Hassien's termination was appropriate.

Hassien then proceeded to the next step in the review process: a hearing on his termination. UCI appointed a hearing officer, and the hearing occurred over two days on UCI's campus (defined above as the review hearing). Among the issues considered at the review hearing was whether "[u]nder [Policy 64], UCI's management decision to terminate Mr. Hassien for misconduct in the performance of his duties was proper, including that it was based upon adequate evidence."

UCI and Hassien were represented by counsel at the review hearing. Both parties were given the opportunity to present opening statements but waived that right. Several witnesses testified, and each party had the opportunity to cross-examine the other side's witnesses. UCI called Martinez, Anderson, and Buckley. Hassien testified and called two witnesses: (1) a former coworker from Palo Verde (known as witness 11),[5] and (2) his brother who was a groundskeeper at UCI. The parties also filed briefs after the review hearing.

The hearing officer issued a 20-page opinion and award finding in favor of UCI (the award). The award explained the various issues that were the subject of the review hearing, the background facts, the applicable policies, and the parties' positions. It then set forth the hearing officer's analysis, including citations to evidence, and concluded that there was adequate evidence to support Hassien's termination.

---

[5] Witness 11 had declined to participate in the EOD Office and HR's investigation.

14

IV.

THE WRIT PROCEEDING

Hassien filed the petition in the trial court under Code of Civil Procedure section 1094.5, seeking an order directing the Regents to set aside the award and his termination. He argued that (1) UCI's hearing was unfair because he was denied the chance to cross-examine complainant or any of the 10 witnesses interviewed during the investigation; (2) his termination was not supported by substantial evidence because it was based entirely on uncorroborated hearsay; and (3) Buckley, Martinez, and the hearing officer were biased against him.

The trial court denied the petition. First, it concluded that Hassien had no right to cross-examine complainant at the award hearing. Also, nothing in the review hearing's procedures prevented him from calling complainant or any other witnesses at the review hearing. Since he called other witnesses, he presumably knew he could call complainant or any of the 10 interviewed witnesses to testify. But "[f]or whatever reason, [Hassien] just did not do so."

Second, the trial court found there was sufficient evidence to support Hassien's termination. It noted that UCI's policies permitted the use of hearsay in administrative proceedings. Further, the evidence presented in the report was reliable because several witnesses corroborated each other's accounts.

Finally, the trial court ruled that Hassien had not provided actual evidence of bias. Rather, he "re-weigh[ed] the evidence from his perspective, and conclude[d] that, because [the relevant parties] reached a decision different from his, [they] lack[ed] impartiality."

15

The trial court entered judgment against Hassien and in the Regents' favor. On appeal, Hassien challenges the denial of the petition and seeks an order vacating the award. He generally makes the same arguments on appeal as he did below.

DISCUSSION

I.

BACKGROUND LAW

Under Code of Civil Procedure section 1094.5, "[a] trial court may issue a writ of administrative mandate where an agency has (1) acted in excess of its jurisdiction, (2) deprived the petitioner of a fair hearing, or (3) committed a prejudicial abuse of discretion. [Citation.] 'Abuse of discretion is established if the [agency] has not proceeded in a manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.'" (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169.)

"In an appeal from a judgment denying the writ, we focus upon the decision of the . . . agency rather than the superior court, with the burden being on the appellant to prove the decision was unreasonable or unlawful. [Citations.] We uphold the agency's factual findings if supported by substantial evidence, indulging in the presumption that the record supports the agency's findings of fact." (*Besaro Mobile Home Park, LLC v. City of Fremont* (2012) 204 Cal.App.4th 345, 354.) "We review the fairness of the administrative proceeding de novo. [Citation.] 'The statute's requirement of a "'fair'" trial means that there must have been "a fair administrative hearing."'" (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073.)

16

## II.

### FAIRNESS OF THE REVIEW HEARING

*A. Process Provided*

"It is well settled that a public employee subject to discharge only for cause has a constitutionally protected property interest in continued employment." (*Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 946.) As such, "a permanent . . . public employee facing a termination for cause has a due process right to challenge the factual basis for the termination in a full evidentiary hearing at some point in the termination process. Furthermore, the governmental employer bears the burden of proof in the evidentiary hearing, as '[i]t is axiomatic, in disciplinary administrative proceedings, that the burden of proving the charges rests upon the party making the charges.'" (*Id.* at p. 949.)

Hassien claims he was denied a full evidentiary hearing in which UCI had the burden to prove facts supporting his termination. Rather, he appears to claim the scope of the review hearing was limited to procedural issues, specifically, whether UCI complied with Policy 64 in its investigation and decision to terminate his employment. This claim is belied by the record.

While a portion of the review hearing focused on whether UCI had complied with Policy 64, this inquiry included a review of whether Hassien's termination was supported by sufficient evidence. As set forth in the award, "[t]he issues framed at the [review] hearing" included "Under [Policy 64], UCI's management decision to terminate Mr. Hassien for misconduct in the performance of his duties was proper, *including that it was based upon adequate evidence*." (Italics added.)

Moreover, the award expressly addressed and weighed the evidence presented by both parties concerning Hassien's termination. In

17

particular, it considered Hassien's argument and evidence that complainant had a motive to lie because she believed Hassien had reported her relationship with witness 10 to the EOD Office. The award found that text message evidence presented by Hassien on this point did "not . . . shift the scales significantly" because it "was pulled out of context and it [was] unclear why or when [the messages were] sent."

As to the evidence presented by UCI, the hearing officer noted that complainant appeared reluctant to report Hassien's behavior to Martinez. She only did so after multiple visits and after receiving assurances that she would be protected from retaliation. This evidence cut against Hassien's argument that complainant had lied for purposes of revenge. Further, multiple witnesses corroborated many of complainant's allegations, including that Hassien (1) talked about complainant's breasts, (2) asked complainant about her sex life, including whether she had sex during lunch breaks, and (3) was "'obsessed'" with complainant. The hearing officer also observed that "[w]hile these are demonstrative of only a few of the incidents that were corroborated amongst the witnesses and complainant, this same pattern can be found for many of the allegations." Based on the evidence presented at the review hearing, the hearing officer concluded that it was "more likely than not that [UCI's] decision to terminate Hassien was proper and based on adequate evidence."

Finally, the procedures UCI afforded Hassien at the review hearing complied with due process. Hassien was given a two-day hearing, where both sides were represented by counsel and given the opportunity to provide opening and closing statements. Both sides could call witnesses who testified under oath, cross-examine the other side's witnesses, and make objections. The burden of proof was explained to the parties. A court reporter

18

transcribed the proceedings. And the hearing officer issued the 20-page award outlining the grounds for her ruling with citations to specific evidence. (See, e.g., *Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 883–884 [administrative hearing with similar procedures complied with due process].)

B. *Cross-Examination of Uncalled Witnesses*

Hassien also highlights that UCI did not call complainant or any of the 10 interviewed witnesses to testify. As such, he claims that he was denied due process because he could not cross-examine any of them at the review hearing. We find that he had no such right to cross-examine these specific witnesses.

Our Supreme Court recently explained that "[w]hile live adversarial questioning may be considered essential in the context of a criminal trial [citation], *there is no absolute right to a live hearing with cross-examination in administrative proceedings, even where constitutional due process applies.* As courts have explained in other administrative contexts, "'[d]ifferences in the origin and function of administrative agencies 'preclude wholesale transplantation of the rules of procedure, trial, and review which have evolved from the history and experience of courts.' . . . The judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances.'"" (*Boermeester v. Carry* (2023) 15 Cal.5th 72, 93–94, italics added.)

Hassien attempts to distinguish *Boermeester* by arguing it involved a private university, not a public institution, so no constitutional rights were at stake. (*Boermeester*, *supra*, 15 Cal.5th at p. 87.) Rather, he contends that *Boermeester* only asked whether the petitioner had been given

19

"fair procedure," which "is a more flexible judicially created concept applicable to private organizations in limited situations." (*Ibid*.)

Hassien is factually correct that *Boermeester* involved an administrative hearing governed only by fair procedure and not due process. (*Boermeester*, *supra*, 15 Cal.5th at pp. 86–87.) But his argument is unpersuasive. *Boermeester* unambiguously states that "there is no absolute right to a live hearing with cross-examination in administrative proceedings, *even where constitutional due process applies*." (*Id*. at p. 93, italics added.) Thus, this holding extends outside the context of hearings governed only by the fair procedure standard and covers hearings where due process rights are implicated, as is the case here.[6]

In response, Hassien notes "that cross-examination *is permitted* in public university disciplinary proceedings in certain contexts." But the fact that cross-examination may be *permitted* in certain contexts has no bearing on whether cross-examination was *required* here.

Finally, Hassien could have sought to call complainant or any of the 10 interviewed witnesses to testify at the hearing. Nothing in the relevant rules prevented him from doing so. While it is unknown whether any of them would have appeared since Hassien (and UCI) lacked subpoena

---

[6] *Boermeester* did not address whether "a private university must provide an accused student the opportunity to indirectly cross-examine the accuser or third party witnesses outside of the context of a live hearing when the credibility of the accuser or third party witnesses is central to the adjudication." (*Boermeester*, *supra*, 15 Cal.5th at pp. 96–97.) We do not consider whether UCI was required to allow Hassien to indirectly cross-examine complainant or any of the 10 interviewed witnesses outside of the review hearing. Hassien's argument on appeal focused on cross-examination during the review hearing. We also note that Hassien had the opportunity to review a draft of the report and provide the investigators with a response to the statements of complainant and the interviewed witnesses.

power, he made no attempt to call any of them. Rather, he only blames UCI for failing to do so.

III.

RELIANCE ON HEARSAY

Hassien claims the award is unsupported by substantial evidence because it is based entirely on uncorroborated hearsay. Specifically, he contends the hearing officer's ruling was based on the report, which was written by Buckley using notes from witness interviews conducted by other people. Further, UCI did not call any witnesses at the review hearing with firsthand knowledge of Hassien's conduct to corroborate the hearsay in the report. This argument is unpersuasive.

The hearing officer concluded that hearsay evidence was allowed under applicable University of California policies. Hassien does not contest this finding.

Rather, Hassien's argument is based on authority stating, "'[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence.'" (*Daniels v. Department of Motor Vehicles* (1983) 33 Cal.3d 532, 536.) "There must be substantial evidence to support [an agency's] ruling, and hearsay, unless specially permitted by statute, is not competent evidence to that end." (*Walker v. City of San Gabriel* (1942) 20 Cal.2d 879, 881 (*Walker*), overruled on other grounds by *In re Lucero L.* (2000) 22 Cal.4th 1227, 1244.) This rule, known as "the residuum rule," states that an agency's decision cannot be based solely on hearsay but must be supported by "at least

21

'a residuum of legally admissible evidence.'"[7] (*The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 960–961.)

However, *Walker* recognizes that hearsay alone can be substantial evidence to support an agency's decision when "permitted by statute." (*Walker*, *supra*, 20 Cal.2d at p. 881.) For example, our Supreme Court has explained that "[t]here is no inherent problem with the use of hearsay in [state] bar disciplinary matters. [Citations.] The reliability of hearsay may vary widely, *and even uncorroborated hearsay*, *without more*, may suffice to support an agency decision, provided that such is permitted by statute." (*Conway v. State Bar* (1989) 47 Cal.3d 1107, 1118, italics added.)

Here, Hassien had the burden of showing that the award could not be based entirely on uncorroborated hearsay. (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225 [petitioner has burden of showing error].) But he has not made any attempt to show that the residuum rule applies to UCI's administrative hearings. Hassien has not cited any authority (including the University of California policies) applying the residuum rule to administrative decisions by UCI or the University of California. Nor has he explained why it should apply here; he simply assumes that it does. We will

_____

[7] Hassien also cites *Consolidated Edison Co. v. National Labor Relations Board* (1938) 305 U.S. 197, 230, which states that "[m]ere uncorroborated hearsay or rumor does not constitute substantial evidence." But the United States Supreme Court later held that the residuum rule did not apply to federal administrative hearings. (*Richardson v. Perales* (1971) 402 U.S. 389, 407–408.) Under federal law, "'it is well-settled not only that hearsay can be considered by an administrative agency but that it can constitute substantial evidence.' [Citations.] '[A]dministrative agencies may consider hearsay evidence as long as it "bear[s] satisfactory indicia of reliability," [citation]; and hearsay can constitute substantial evidence if it is reliable and trustworthy.'" (*Lacson v. U.S. Dept. of Homeland Sec.* (D.C. Cir. 2013) 726 F.3d 170, 178.)

not make this argument on Hassien's behalf.[8] (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.)

Besides, even if the residuum rule were to apply here, we find that the award is supported by more than just uncorroborated hearsay. Martinez testified at the review hearing (1) that Hassien had engaged in misconduct under the relevant policies; (2) that it was her decision to terminate Hassien; (3) about prior disciplinary measures taken against Hassien, including warnings against using profanity and loudly arguing with a subordinate employee in public view; (4) about complainant's reluctance to initially report anything about Hassien because she was scared of retaliation; (5) about complainant's reports that Hassien was engaged in stalking, sexual harassment, and other nonsexual harassment; and (6) about how the investigation started.

The above testimony was either not hearsay or was admissible for nonhearsay purposes. For example, Martinez's testimony about Hassien's prior discipline and complainant's allegations was admissible to show Martinez's knowledge of these events and the effect these statements had on her subsequent actions. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 988–989 disapproved of on other grounds by *Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 664; *Holland v. Union*

---

[8] The application of the residuum rule is particularly unclear in cases involving the University of California given its special constitutional status. "[T]he California Constitution has granted the [Regents] quasi-judicial powers regarding matters falling within its broad powers to organize and govern the university, and this includes quasi-judicial adjudication of employment rights." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1485.) "'[P]olicies established by the Regents as matters of internal regulation may enjoy a status equivalent to that of state statutes.'" (*Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 320.)

*Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, 947.) Among other things, this testimony explains why Martinez initiated the investigation into Hassien and why she believed his termination was warranted.

Martinez's testimony, which the award referenced, was then corroborated by the hearsay statements in the report. We need not repeat the specific evidence supporting UCI's decision to terminate Hassien. In short, complainant's claims that Hassien had stalked and sexually harassed her were corroborated by multiple witnesses.

IV.

IMPARTIALITY

"'When, as here, an administrative agency conducts adjudicative proceedings, the constitutional guarantee of due process of law requires a fair tribunal. [Citation.] A fair tribunal is one in which the judge or other decision maker is free of bias for or against a party.'" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 215; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1448 ["The right to a fair procedure includes the right to impartial adjudicators"].)

"[A] party seeking to show bias or prejudice on the part of an administrative decision maker [must] prove the same with concrete facts: "'Bias and prejudice are never implied and must be established by clear averments." [Citation.] Indeed, a party's unilateral perception of an appearance of bias cannot be a ground for disqualification unless we are ready to tolerate a system in which disgruntled or dilatory litigants can wreak havoc with the orderly administration of dispute-resolving tribunals.'" (*Breakzone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1237.)

Hassien alleges Buckley, Martinez, and the hearing officer were all biased against him. As to the first two individuals, Hassien has not shown

24

that the impartiality rule applies to them. Buckley and Martinez were not part of the decision-making body at the review hearing. (See *Today's Fresh Start, Inc. v. Los Angeles County Office of Education*, *supra*, 57 Cal.4th at p. 215.) Rather, they were called as witnesses on UCI's behalf. Nor has Hassien explained why this rule should extend to them, and we will not make this argument for him. (*Allen v. City of Sacramento*, *supra*, 234 Cal.App.4th at p. 52.)

As to the hearing officer, Hassien has not provided any concrete facts showing bias. Rather, he believes she was biased because she did not interpret the evidence in the same manner as him. His whole argument is that she "bent over backwards to uphold the termination decision, even determining that individuals whom she had never seen or observed were credible and had no motive to lie based on her reading of their written statements alone." Hassien's "'unilateral perception of an appearance of bias'" by the hearing officer is insufficient proof of actual bias. (See *Breakzone Billiards v. City of Torrance*, *supra*, 81 Cal.App.4th at p. 1237.)

DISPOSITION

The judgment is affirmed. The Regents are entitled to their costs on appeal.

MOORE, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.